STUBBLEFIELD *et al. v.* STATE *ex rel.* FJELSTAD.

(*Jackson*, April Term, 1937.)

Opinion filed June 17, 1937.

GALLOWAY & GALLOWAY, of Memphis, for plaintiffs in error.

WINCHESTER & BEARMAN, of Memphis, for defendant in error.

MR. SPECIAL JUSTICE F. T. FANCHER delivered the opinion of the Court.

This is a *habeas corpus* case and there is involved on the appeal the custody of the relator's child, Diana, who

is four years of age. The respondents are T. F. Stubblefield and Grover Stubblefield. T. F. Stubblefield is the greatgrandfather of Diana and Grover Stubblefield is her greatuncle. They reside in an apartment over a retail grocery store and market operated by respondents on Poplar street, Memphis. The building fronts on Poplar street, and the apartment above opens on Belvedere, the side street. Diana has been living with them since some time before the death of her mother.

The mother of the child was named Mary Royster. She was the granddaughter of T. F. Stubblefield and was the wife of the relator Sidney Fjelstad. Sidney Fjelstad and Mary Royster were married on May 28, 1932. The relator is 33 years of age. Grover Stubblefield is 50 years of age. The wife of T. F. Stubblefield is dead. Grover Stubblefield has been married twice, his first wife being dead and his last wife having divorced him on grounds of cruel and inhuman treatment.

After the marriage of relator and Mary Royster they lived in Washington for a while. Relator was an employee in a department store; later they moved to New York because the wife wanted to be near her sister and relator lost his position in Washington because of this. On April 20, 1934, while they were living in New York, Mary Fjelstad left her husband, ostensibly to visit her relatives in Memphis. She had said nothing about deserting or leaving relator. She took Diana with her. After going to Memphis, Mary Fjelstad went to Crittenden, Ark., and on December 15, 1934, obtained a divorce from her husband. She was also given the custody of her child. This was kept secret from him and she then went back to Memphis and she and Diana lived with

respondents in their apartment.   She contracted tuberculosis and died on February 3, 1937.

The petition in this case was filed February 15, 1937, and a final decree was rendered on March 13, 1937, in which the writ of *habeas corpus* was granted and the defendant Stubblefield was directed to release the said Diana Fjelstad and place her in the custody of her father, Sidney Fjelstad.   It was adjudged that the father is entitled to the care, custody, and control of his minor child with permission to take said child to his home in the city of Washington.   Pending the appeal Diana was considered a ward of the court, but her custody was placed in the hands of respondents with instructions not to remove her from the jurisdiction of the court.

The apartment in which the respondents reside consists of seven rooms with bath, kitchen, etc., and has all modern conveniences.

For six years the members of relator's family have lived at 2301 Cathedral avenue, Washington, D. C., which is one block off Connecticut avenue.   This apartment has a living room, large corner bedroom with two beds, another large bedroom, kitchenette, dinette, with various closets and elegant furnishings, all on the fifth floor overlooking Rock Creek Park.   The rear of the building faces on the park and is regarded as one of the finest places in Washington to live.   Relator lives with his father, brother, and sister.   The father is 71 years of age and retired.   His brother, Arnold C. Fjelstad, is an associate picture editor for the Washington Times, a Hearst evening paper and makes a salary of $160 per month.   Relator's sister, Mrs. Branson, is employed in one of the government offices at Washington and receives a salary of $2,600 per year.   It appears that Arn-

old C. Fjelstad also receives other compensation for what he terms, "free lance writing."

Respondent supported his wife and child up to the time she left him in 1934. Respondent stayed in New York a while and then went to Memphis. He communicated with his wife while she was in Memphis and they continued to correspond up to near the time of her death. Relator visited his wife on occasions after she had gone to her grandfather's, but later he was prevented by Grover Stubblefield from coming to the home. Relator sent money for her support, but not any large amount. Respondent, Grover Stubblefield, says that he cashed the checks and they did not amount to over $100. He sent presents at various times to Diana, and has manifested his affection for and interest in her, in many ways.

Relator is criticized very much because he held no permanent position from the time he left New York until he secured his position where he is now employed, and it is true that he only secured temporary work with a salary sometimes as low as $10 or $15 per week. It seems that he was one of the millions of stranded persons tossed hither and thither during the depression. At the present time relator is employed by the Palais Royal, one of the large department stores at Washington. He has a salary there of $100 a month.

T. F. Stubblefield was formerly a lawyer, and is a man of good character, and so is his son, Grover.

Mrs. Herbert C. Castle, a sister of Grover Stubblefield, lives just across the street from her father and brother. She was introduced as a witness on behalf of relator. She manifests considerable interest in his behalf. While she is on good terms with her father, she and her brother have had serious difficulties. Many wit-

nesses, both in Memphis and Washington, testify to the good character and gentlemanly qualities of the relator.

Respondents own the building in which they operate the grocery store and in which they reside. It is shown that they are financially able to take care of Diana, which they offer to do. Relator has no property and cannot promise so much from a financial standpoint; however, his sister and brother, who are both unmarried, promise to aid him in taking care of Diana in case he needs assistance.

Several witnesses attest the good character of relator's family. Mr. John W. Childress, formerly of Nashville, Tenn., and now holding a government position in Washington, and other Washington citizens, speak very highly of Stella F. Branson, relator's sister. Respondents say that when Mrs. Branson is away during the day no one will be at the apartment to look after the child except a colored maid named Jessie. This is true, as the family is now constituted, but inasmuch as relator and all of his family, including his father, brother, and sister, promise the utmost that can be done for the child, we anticipate no difficulties on this score.

Some criticism is made by counsel for relator of the dangerous character of the place where respondents reside because of its being on a busy thoroughfare in Memphis, and there are many minute details brought out on the proof on either side of the case; but considering all the facts and circumstances, it can be said that no serious criticism should be passed upon the character of any of these parties or of the desirability of the places where they reside.

Respondents introduce what appears to be a will signed, "Mary Royster," the mother of the child, in

which she wills her share of her grandmother's estate to her uncle, Grover Stubblefield. The will also contains the following paragraph, referring to Grover Stubblefield:

"Having trusted him in life and especially in the last few years to provide for me and my baby, Diana, I will trust him in death to further provide for her."

This, of course, can have no legal bearing other than that the deceased was willing to commit to her uncle the care and custody of her infant daughter.

The evidence shows conclusively that the child will be looked after and cared for and given the best of treatment and education if left with either of the parties. She is a very beautiful and lovely child and much beloved by all of them.

We will now discuss the legal principles governing the case. Upon the principles of the common law, the father had the exclusive and legal right to the custody and services of his minor child. This was said to be his natural right, even against the mother. *State* v. *Paine*, 4 Humph. (23 Tenn.), 523.

But under modern law there is no absolute right in the parent to the custody of his own child. The court will hold the welfare of the child superior to the affections of such parents as cannot show themselves qualified to properly care for, educate, and train them. *State* v. *Kilvington*, 100 Tenn., 234, 235, 45 S. W., 433, 41 L. R. A., 284.

Carrying out this enlightened, human consideration this court denied to a father residing in another state the custody of his eight year old son under evidence showing that the father had lost his custody by cruelty to mother and child, and that the child was well taken

care of in Tennessee. *State ex rel.* v. *Rose*, 167 Tenn., 489, 71 S. W. (2d), 685.

It is our opinion, however, that the facts should be considered well and the court would not be justified to disregard or fail to properly weigh considerations of parental right. The parent's right is certainly paramount, other considerations being' equal. A father is *prima facie* charged with the proper care and is entitled to custody of his child unless that custody is resisted on grounds that he is not fit for the trust, and the objection can only be sustained by a clear preponderance of convincing proof. The presumption is in his favor in the absence of a clear showing that he is disqualified for the proper discharge of parental duty. The court cannot lightly, and without good cause, invade the natural right of the parent to the custody, care, and control of his infant child.

As stated in *Hernandez* v. *Thomas*, 50 Fla., 522, 39 So., 641, 645, 2 L. R. A. (N. S.), 203, 111 Am. St. Rep., 137, 7 Ann. Cas., 446:

"In accordance with the prevailing rule in the American courts, that in awarding the custody of children the paramount consideration is the welfare of the child, rather than the technical legal right of the parent. While this is true, yet the court should not lightly and without good cause invade the natural right of the parent to the custody, care, and control of his infant child."

In the case of *State ex rel.* v. *Richardson*, 40 N. H., 272, the Supreme Court of that state held:

"*Prima facie,* however, the right of custody is in the father; and when the application is resisted upon the ground that he is unfit for the trust, by reason of grossly immoral conduct, harsh usage of his child, or other

cause, a proper regard to the sanctity of the parental relation will require that the objection be sustained by clear and satisfactory proofs.''

This proposition of law was likewise clearly stated in the case of *State ex rel.* v. *Martin*, 95 Minn., 121, 103 N. W., 888:

''The right of a parent to the care and custody of his minor child is, both at common law and under the statute, paramount and superior to the right of a third person. The presumption is that the parent is a fit and suitable person to be intrusted with the care of his child, and the burden is upon him who asserts the contrary to prove it by satisfactory evidence.''

We quote from 46 C. J., pp. 1228-1230:

''A parent who is of good character and a proper person to have the custody of the child and is reasonably able to provide for it ordinarily is entitled to the custody as against other persons and this rule applies although such others are much attached to the child and the child is attached to them, and prefers to remain with them, and they are in all respects suitable to have the custody of the child and able to support and care for it, or even though they are better able to afford the child material advantages.''

It is further stated in above authority that these rules have been applied in favor of father or mother against grandparents, aunts, and uncles, maternal or paternal.

In *Clarke* v. *Lyon*, 82 Neb., 625, 631, 118 N. W., 472, 474, 20 L. R. A. (N. S.), 171, it is said:

''The court has never deprived a parent of the custody of a child merely because on financial or other grounds a stranger might better provide. The statute

declares and nature provides that the right shall be in the parent, unless the parent be affirmatively unfit.''

We need not multiply authorities. The foregoing are typical of the strong current of judicial thought in our country.

■ It is said by respondents that if a mistake should be made in awarding the custody of the child it can be corrected if she is left in this state within the jurisdiction of the court, whereas if taken from the state the mistake would be without power of correction. There is force in this suggestion if it be considered a doubtful case, but we see advantages in granting the custody to the father. The aged greatgrandfather may pass away, then the sole custodian would be this crusty greatuncle who drove this relator away when he went to give presents to his child, who cursed and abused his sister, Mrs. H. C. Castle. She is a witness for the relator and says her brother is an improper person and unqualified to rear the child.

There is no woman member of the family to help respondents in the training and caring for the little girl. On the other hand, if placed with her father in his family, the child will have the help of relator's sister, and witnesses testify she is an elegant, refined, and capable woman with whom the child lived for several months. She states she has great affection for and interest in her. There is no just suspicion from this record against the father. Counsel for respondents, in his zeal, considers him unworthy, but we do not. He has been unfortunate, but his present employer speaks highly of him and indicates his employment will be permanent. Then we consider the father has some rights, even though the paramount consideration is the welfare of the child. If

worthy, and we think he is, we should not deny him the right to rear his own daughter according to his conceptions of her best interest.

After a close and careful study of the case, we are fully persuaded that the judgment of the trial court is correct and is therefore affirmed.

The case will be remanded to the lower court to carry out the decree.