# BETTY K. BEVINS, Appellant, v. ERRETTE S. BEVINS, JR., Appellee.—383 S.W.(2d) 780.

Eastern Section. April 23, 1964.

Certiorari Denied by Supreme Court August 28, 1964.

Joe R. Haynes, Knoxville, for appellant.

Ray L. Jenkins, Knoxville, Jenkins & Jenkins, Knoxville, of counsel, for appellee.

AVERY, P.J., (W.S.), This case comes to this Court from the Court of Domestic Relations of Knox County on appeal from a decree entered by the Honorable Richard F. Douglass, Judge of said Court.

The question here involved relates only to the custody of two daughters of these litigants, the older, Brenda, approximately seven years, and the younger, Lisa Ann, a bit over four years.

This is the type of case that tries the heart of every Court that has to determine and decree the custody of little children as between their father and mother.

This case was filed on the 5th day of August 1962, and by it the wife and mother sought a divorce. She sought the custody of and support for the children and alimony for herself. She sought injunctive process with respect

to property and with respect to the immediate custody of the children. She sought writ of attachment to be levied upon the property of the defendant. Both writs were issued and now appear in the record as having been served. She also sought temporary alimony for herself and support of her children, and which temporary alimony included a reasonable fee for her attorney.

Her bill alleges cruel and inhuman treatment in proper phraseology as related to the facts of this case, but it is not necessary in this opinion to allege in words that which she says is cruel and inhuman treatment.

The original bill was answered on September 4, 1962, and this answer was coupled with a cross-bill which described conditions under which the cross-complainant had lived and alleges activity upon the part of the cross-defendant, mother of these children, who is shown to be sick by all the proof in the case and as alleged in the cross-bill. Cross-complainant sought custody of these two children and an absolute divorce upon the allegations contained in the bill, which it is not necessary here to set forth.

Upon proper notice of order temporary alimony for the original complainant and the two children was fixed at $60.00 per week and an allowance for her attorney as a part of her alimony of $350.00, partial pay for his services as will be more fully referred to hereinafter.

On October 27, 1962, the answer to the cross-bill was filed which is very descriptive in its reply to the charges made in the cross-bill, and specific with regard to her physical condition.

The record shows that the complainant and defendant each were 33 years of age when the case was first heard.

These parties had been married for a little more than 12 years. The home of complainant was in LaFollette, Campbell County, Tennessee, and defendant's home was in Knox County Tennessee. After their marriage, the defendant being in school in Memphis, they lived in Memphis for approximately two years, and thereafter defendant was in the military service for two years, and thereafter they lived in LaFollette for about two years, and then in 1957 they moved to Knoxville, having lived there for about five years when the original bill was filed. At the time the bill was filed the complainant and children were living in the home of her parents in LaFollette, Tennessee, and the defendant was living in Knoxville, Tennessee, where they had bought a home and which was deeded to them, the title being taken as tenants by entireties. The defendant was a pharmacist and worked with his father in the drug business, there being three separate drug stores owned by the father, the defendant and his brother and each owning a one-third interest.

The proof in the case was presented orally before the Court beginning on the 15th day of July 1963. The record shows that after the Court was opened:

"Medical reports pertaining to the illness of the complainant, Mrs. Betty K. Bevins, were read, definitions of various medical words were read, and a phamplet pertaining to 'Multiple Sclerosis' was read, all of which were filed by Mr. Haynes as complainant's COLLECTIVE EXHIBIT I."

Oral testimony of both parties, their respective fathers and mothers, together with neighbors and friends was given. The case was not finished on January 15, 1963,

and for some reason which we are sure was proper, the hearing was passed until January 28, 1963, when the trial was renewed and continued through the 29th, 1963.

For the purpose of this opinion it is only proper to say that the decree or judgment of the Court was entered on the 8th day of March 1963, nunc pro tunc as of January 29, 1963, and from that proof and the decree it is shown that the children, at the time of the hearing, were with their mother in the home of their maternal grandparents in LaFollette, Tennessee, and that the oldest child, Brenda, was in school and was making reasonable progress in the school. It is also shown that the mother was sick, suffering from a disease diagnosed by physicians in Mayo's Clinic and local doctors, as "Multiple Sclerosis", the effect of which is explained by a doctor at a future hearing, and filed in the record is the definition of the medical terms used in connection with the explanation of that designated disease shown by the pamphlet which explains the disease, as used by the doctor in the final hearing on the whole record. Suffice it to say that the Court found, and correctly so, that the mother was not in condition to take care of the children at the time the decree was pronounced, but due to the fact that the oldest daughter was in school, the Court decreed that they continue with their mother until the end of that school term and then said in that decree:

"and that unless, at the end of the present school term in LaFollette, Tennessee, she has shown substantial improvement, the custody of the children will be awarded the father, the defendant and cross-complainant, Errette S. Bevins, Jr."

While this order does not so state, apparently the judgment for the support of the mother and the children

was left in force until the case was heard again on oral proof introduced on July 2, 1963, which was apparently after the school term referred to in the temporary order hereinbefore shown ended, and the decree was entered on July 12, 1963, in which the Court held that the charges in the cross-bill were not sustained by the proof, but that the charges in the original bill were sustained, and found:

"That the defendant, Errette S. Bevins, Jr. has been guilty as charged of such cruel and inhuman treatment and conduct toward complainant as renders it unsafe and improper for her to further cohabit with him and be under his dominion and control. That complainant has been true to her marriage vows and gave the defendant no reason or cause for his misconduct, nor has she condoned the same/''

He then decreed that the cross-bill be dismissed, an absolute divorce to complainant, who was restored to all the rights of an unmarried person. He also found that the original complainant was still a sick person "and presently unable to care for these children." He then decreed:

"The defendant, Errette S. Bevins, Jr., shall have custody of the children, beginning with the fall school term. Complainant shall have all reasonable privileges of child visitation, including but not limited to her having the children on alternate weekends. Presently the defendant shall have the children during the month of July, thereafter returning them to complainant with whom they shall remain until school time."

He also decreed that defendant will pay complainant alimony in the amount of $35.00 per week thereafter, and an additional amount of $25.00 per week for child sup-

port when the children are with her for one week or longer.

He also directed a division of the property as set out in the decree, which is not necessary to further refer to in this opinion because the complainant appealed only from that part of the decree which granted the defendant-father the custody of the two children at the time stated in the decree. That decree also provided, with respect to the children, as follows:

"This decree shall be retained upon the docket of the Court for the purpose of enforcing the provisions herein made and for such future orders as may be proper, and either party may make application by petition. Furthermore, a report on the status of complainant's physical condition may be made to the Court at the conclusion of the regular 1963-64 school term, in early June, 1964."

The appeal was prayed, perfected and this case was heard by the Western Section of the Court of Appeals of Tennessee sitting in the Eastern Section at Knoxville, Tennessee, on the 11th day of December 1963. It was taken under advisement and is now being determined by this opinion.

There is only one assignment of error. It is stated in these words:

"The Court erred in failing and refusing to award custody of the two minor daughters to complainant. This was error because the evidence does not establish that complainant's custody of these children would jeopardize their welfare."

We approach the decision in child custody cases, under our statute authorizing review by the Appellate

Courts, as we do the ordinary civil suit. We review them de novo. Smith v. Smith, 188 Tenn. 430, 439, 220 S.W. (2d) 627, and many other cases to the same effect could be referred to. However, we also are faced with the statutory provision on such review that the opinion of the trial Court is presumed to be factually correct as well as legally correct unless the evidence preponderates against the judgment of the trial Court, or of course, unless the trial Court committed legal error.

■ We are also faced with the problem that the welfare of the child is the paramount consideration of the Appellate Courts as well as the Courts of original jurisdiction. Counsel for appellant has referred to Logan v. Logan, 26 Tenn.App. 667, 176 S.W.(2d) 601, as a basis for this statement, and of course many other cases are to the same effect. It is not what is best for the father or mother or grandparents that the Court determines, it is what is best for the involved children. It is not determined by the financial capacity of the father or the mother, nor is it determined upon the basis of the wishes of grandparents, nor their financial ability. The real matter to be considered is what is the best thing to do with these children that they may be left in a home where they are nurtured, loved, appreciated and where the environment is such that is conducive not only to the physical welfare of the child, but to its emotional and moral welfare, and where it can have the instructions from those who have control over it to inspire it to activities so as to develop a personality prepared for a life of service, and to successfully compete in the society which the child faces when an adult. Stated in a few words, it surely could be said that if there is a supreme rule to follow, that the consideration to be given determinative

significance is in "respect to its temporal, and its mental and moral welfare" of the child as such, and the personality that it is expected to be when it becomes an adult.

Such is the rule stated in Smith v. Smith, 188 Tenn. 430, 220 S.W.(2d) 627, and it is further stated therein:

"Under modern law it is universally held that the parent has no absolute right to the custody of his own child. The courts uniformly have held that the question is the welfare of the child. State [ex rel. Bethell] v. Kilvington, 100 Tenn. 227, 234, 45 S.W. 433, 41 L.R.A. 284; Baskette v. Streight, 106 Tenn. 549, 62 S.W. 142; State ex rel. [Jones] v. West, 139 Tenn. 522, 201 S.W. 743, Ann.Cas.1918D, 749; In re Knott, 138 Tenn. 349, 197 S.W. 1097; Stubblefield v. State ex rel [Fjelstad] 171 Tenn. 580, 106 S.W.(2d) 558."

After reading the proof in the instant case, had it not been for this disease with which the mother was afflicted, we are persuaded to believe that Judge Douglass might have reached a far different conclusion, and certainly this Court has pondered that situation since it began to study the record in this cause, which has been from the very instance in which it was argued in this Court by counsel for each of the parties.

In this connection it is genuinely pleasing to this Court to state in this opinion, that each one of the attorneys representing the respective parties, has so conducted himself throughout the trial of this case as reflected by the record in this Court, without bias, prejudice, sentiment, or sympathy one way or the other, and has been extremely cooperative with the trial Court in his effort to have him reach a just, fair and righteous consideration

and decree with respect to the custody of these two children. Again it should be said by this Court that Judge Douglass gave much thought and study in his effort to come to a proper conclusion of the matter involved. His decree reflects such action, as well as the record as a whole, but there is no decree which can be entered in this case to please all the persons involved.

Now with the guiding "polar star" to be reached as we determine what we shall do, for whatever we do will be temporary insofar as our statutory requirements are concerned, the case must go back to its original jurisdiction there to remain upon the docket for any modification of the decree in the future that the Court there may find to be necessary growing out of the changes that may occur in the days that lie ahead. Thus we do our best to analyze the situation with respect to what the children may face if placed in the custody of the father or that of the mother.

Let us look at the home of the father. If the custody of these children should be given to him, for the greater part of time, he would have to employ domestic servants of a character that can be responsible for the home life,—to so use the term, of these children, or he will have to live in the home of his parents, and the children to be, for the most part, in the control of their paternal grandparents. There is no doubt that the home of the paternal grandparents is a most comfortable place for them to live. The home itself is spacious, having three bedrooms, three separate baths, dining room, kitchen, living room and the other necessary floor space, along with an abundant lawn located upon a land area of approximately 60 acres. This record shows that the paternal grandmother sometimes works in the merchantile establishments,

which are drugstores, owned by the paternal grandfather and his two sons, one of which is the father of these two children. These stores are separated, and the record indicates that each of the sons is in charge of one of them and that the father of these children more nearly in charge of the other, which perhaps is the one where the paternal grandmother works, and that the paternal grandfather has supervision of all these business establishments. The record also shows that he suffers to such an extent with migrane headache that he uses a drug or stimulant to relieve it. If the children are left in the home of the paternal grandparents,—and certainly they will be for some of the time, then this grandmother is going to have to refrain from the labor that she does at the stores for that part of the time at least, when the children are at home, out of school, and the younger of the granddaughters is not yet of public elementary school age. Their father will be at work in the store, will not be available to stay at home with these children, and certainly the grandfather who appears to be supervisor of the businesses, will not be at home with them. To say that they would not be loved, and have the best of care that conditions available can afford them if left with their father and he lived with his father and mother, would be underestimating the love of the father, the love and devotion of the paternal grandmother and the interest, love and care of the paternal grandfather. However, if their father left them in the care of some servant they will miss the sustaining devotion and love which they will so greatly need.

Now we come to an examination of the other side of this picture. This record reflects that since the separation of the father and mother, both of the children have

been in the home, for the larger part of the time, of their maternal grandparents. Their housing facilities are ample. There are three bedrooms and all of the other necessary equipment, such as bathrooms, playrooms, living room and a basement the full size of the home. This home is located on six acres of ground with a large yard space, and it is shown by the witnesses that located in this playroom of the maternal grandparents are the toys, such as tricycles, tent, wagons and all kind of things to play with, including a wading pool, seesaw and swings. Mr. Kirtley is 56 years old, the only child that the maternal grandparents have is the mother of these children. His interest in this only child, his daughter, is evidenced by the fact that he paid her bills when she went to Mayo's Clinic in Rochester, Minnesota, to the extent of $500.00. He states that he paid for her hospitalization on two different occasions in the Baptist Hospital, and that he carried her to some other place in an effort to give her treatment and paid her bills there, and gave her money to a considerable amount at different times. He is a perfectly well man with best of habits.

Mrs. Kirtley does not work, and describes herself as "I am a housewife strictly". The record further reveals that she has taken the responsibility for these children since they have been in their home and she describes the situation that existed between the children and their mother when they first came to their home that must be attributed to what they themselves had experienced in the home of their father, particularly after their mother had become sick, and the father had gotten to the point that he would make reference to the condition of his wife with the same terms that these children used toward their mother when they first came to the home of their mater-

nal grandmother. It seems useless to repeat those statements here for this maternal grandmother testified that it took about two weeks to get them to where they would not,—that is to get the older one to where she would not say ugly things to her mother.

The testimony of the respective grandparents indicates that each of them had taken sides, so to speak, with their respective children, that is that Mr. and Mrs. Bevins would support their son in his attitude toward his wife and the children, and Mr. and Mrs. Kirtley would support the attitude that their daughter had toward her husband, to a considerable degree. It may be that we could easily say such attitude is natural on the part of fathers and mothers, however, it should be remembered that the trial Judge, from that part of whose judgment there has been no appeal, granted to this sick mother a divorce absolute upon the evidence introduced, and decreed that the husband,—father of these little girls had been so cruel to his wife, the complainant, as that the Court could conscientiously pronounce a decree of cruelty and hold that such state of facts existed with respect to his actions and attitude toward his wife that this home could not be continued upon a basis of home life that would be conducive to the rearing of the children, and especially to that consummation of husband and wife relationship that is necessary to the happiness of any home.

The trial Judge also found that when the case was heard, the home where these children were at that time, was such a place as that they should be left there during the entire balance of the school year, and in his decree he has provided that the children would be placed in the custody of the father, and as we understand his decree, that

it might be reviewed in June of 1964. If we properly understand his decree, that was to determine the improvement in the health of the mother that had been made or would be made up to that future date.

There is no doubt that this record shows by the proof of several neighbors, and persons who were associated with the mother of these children during the last six months before this case was tried, that her condition had improved, and that much of the fault which could be found in the condition which existed when she first left her home as a sick mother, physically, emotionally and psychologically, and came into the home of her father and mother as regards the attitude of the children toward her and her attitude toward them, had greatly changed for the better. On the other hand, there is no doubt from the testimony in this record, based upon that of a competent physician as well as upon the medical history of the disease of multiple sclerosis that the mother will never be a completely well person. There is ample proof, however, that there will be intervals, some of which may be for long periods very likely, that she will be her normal self.

There is proof positive of the fact that when she first left her husband and went to the home of her parents, she was practically bedridden, and that at the time of the latter hearing she had improved to the point wherein she could do some minor chores in the home and that she did some of her own shopping and shopping for the children, and that she did some work at her church in the way of helping the church secretary. She was encouraged in these activities, because such activities tend to create within patients who are suffering with multiple sclerosis that necessary confidence in the capacity and

ability and strength of themselves to bring themselves back to a situation where they could do the things they formerly were able to do. It is not shown they will ever be completely well, but it is shown that what a patient needs is that sort of confidence in themselves which enables them to motivate their own bodies and to do work which inspire them to do additional work, or a better work of the same character.

It will serve no good purpose in this opinion to point out those unguarded expressions that have been said by the grandparents, parents or witnesses, for a careful reading of the record indicates that the testimony of witnesses favorable to either party magnifies little incidents such as trivial phrases that the children used or statements made by a sick mother and disturbed father, and have builded their own opinions upon such statements a superficial structure of partiality in favor of the party to the lawsuit with whom they agree a personal mental framework structure out of all proportion to the basic issues here involved. This applies somewhat to the statements made by the grandparents, an anlysis of which leads one to feel that the paternal grandparents had come to the conclusion that the mother of these children was a "spoiled brat" in her childhood, she being the only child in the family, and overlooking the fact that they had no experience in the rearing of little girls.

Likewise, the maternal grandparents likely regarded their son-in-law as very unkind and somewhat unreasonable in saying his wife should be "committed". There are some contradictory statements made with respect to what was said by the parents of these children in the presence of the respective grandparents.

We should, however, make some reference to what the doctors have said, and while Dr. George E. Henson has stated that he did not believe that Mrs. Bevins, the mother, would ever be able to take care of the two little girls by herself, it is nowhere stated by any witness that if she had the help of her mother and father with the children, such as certainly she had a right to expect, that would be an undesirable situation in which these quite young girls might live for a few more of their tender years at least. Furthermore, it is admitted by this Court and by all who are conversant with the facts in connection with this case, that the mother will not be able, because suffering with this disease referred to multiple sclerosis, the cause of and the cure for which is not known to the medical profession, is certainly not an insane person. Dr. Henson who had not seen her professionally since March 1961, though he had been her physician for quite sometime before that, on cross examination expressly stated that she was not mentally unsound. The exact questions and his statements in that regard are as follows:

"Q—You are not saying to the Court that when you saw this lady almost two years ago, that she was mentally unsound?

"A—She's never been mentally unsound. Anxiety state is an emotional illness, not a mental illness.

"Q—And if there is, for instance, unhappiness in home life, and that unhappiness is removed, an anxiety problem could diminish?

"A—It could, yes, sir.

"Q—Doctor, if a mother with an anxiety state improves her conditions, and the anxiety state is lessened,

could then the taking on of additional responsibility with a child, even a child, perhaps, toward whom there had been some hostility, benefit the mother, that is, to have this responsibility and to have this outlook?

"A—It would on the condition that the specific anxiety involved with the child improved.

"Q—I believe you said that you were not able to determine what caused this anxiety state or hostility?

"A—I never was."

Dr. Henson described his educational advantages and his practice over a period of 50 years and said a good extent of his practice was psychiatric work. He explained that his treatment of the complainant was entirely "psychiatric interviewing", saying that:

"My treatment of her, the psychiatric interviewing that we did, was to try to overcome depressive feeling and to see if we could improve the relationship between her and her oldest daughter."

Dr. Zelma Herndon, a female psychiatric specialist, explained her background, experience and education, said that she had been given the reports from Mayo's Clinic, the Psychiatric Services in Knoxville and at St. Albans Hospital and other reports, and that with these reports she had seen her on March 12, 26, April 11, May 21, June 18, and that she had seen her back in February. She made a long statement in response to proper questions describing multiple sclerosis and she said that no physician could predict with reasonable certainty when the flare-ups with this disease would come nor the regularity of them, and then stated:

"You cannot determine whether they will have one event of flare-up or two, or they may only have one and live many years without ever having another one. This is not predictable as to when this can occur. Since the etiology of the disease is unknown, there is no known acceptable treatment that is considered a cure, curing the condition, and for that reason, of course, not knowing the etiology, you can't predict the course of this disease, but most of these patients have long periods that they can go along and live perfectly normal. One particular case that I have had—the mother of 3 children has returned to her home, after an acute flare-up, and she has had two, and she has taken over the full role of mother, managing and cooking, wife and everything else in the home."

She then explained that Mrs. Bevins had a lack of confidence in her own ability and that "most of these people are a little more drastic than she has been". She then said that she felt like there had been considerable improvement with the patient and her exact words are:

"I think that we have accomplished quite a few things. She is now going and doing some work at the church. The last time I saw her, she was going twice a week and helping get out some literature and getting the church programs ready for Sunday. It was late in the school year. She had gone to one or two PTA meetings for the oldest child. She has had a few social activities, such a bridge parties. As you know, summer is not a good time for these, so these have been dropped. She has taken more interest in the home and has done more in helping to take care of herself and her children and has supervised some of the play of the children, now that they are home on vacation. I think

she expressed the opinion to me that she would be perfectly capable of taking care of the children, if she had adequate funds to maintain the apartment and some help one or two days a week."

She then explained how that when she first saw Mrs. Bevins she got the impression from what she said and how she reacted to her statement that she had a lack of confidence in her own ability and felt inadequate to do anything hardly, and then said:

"by encouraging her and pushing her and persuading her and pointing out to her that she can do these things, she is gradually taking over more of the complete care of her children."

The lay proof with respect to the apparent attitude and activities of the complainant during the last six months immediately prior to the hearing greatly preponderates to the effect that there has been a considerable improvement in complainant since the separation from her husband and since she and her children left home to be with her parents, and this proof is by people who had opportunity to see and know what her actions were.

On the other hand the proof of any lack of improvement was by lay witnesses who had not had the opportunity to be with her or see her to any extent during the past five or six months immediately prior to the July hearing.

Counsel for complainant-appellant has said:

"The law in Tennessee, applicable to the instant case, was laid down in the decision by Special Judge Mc-Campbell in the case of Weaver v. Weaver, 37 Tenn.

App. [195] at page 202, [261 S.W.(2d) 145], wherein the Court stated:"

He then quotes a great deal from that particular case, making reference in his quotation therefrom to the several cases and texts which are referred to.

Some of these quotations from the respective cases and particularly in Weaver v. Weaver, supra, we here quote as follows:

"The determining facts in these adoption and custody cases are so infinite in their variety that the reported decision in one case is of little aid or assistance in settling the next. The supreme rule to which all others should yield is the welfare and best interest of the child." Holloway v. Bradley, 190 Tenn. 565, 571, 230 S.W.(2d) 1003, 1006.

So when we look at the case of Weaver v. Weaver, supra, the facts as outlined in the very fine opinion of Special Judge McCampbell, we do not find a great deal that factually is in common with the facts we have in the instant case. It is true there is something said about psychiatric interviewing, etc. interwoven with some sort of alleged clandestine activities, but we certainly do not have in the case before us any alleged or intimated infidelity on the part of either parent of the involved children. There are some statements in Weaver v. Weaver that do fit into the picture to some extent. As stated therein:

"A mother, except in extraordinary circumstances, should be with her child of tender years." (See authorities cited therein)

"Normally, such a child will not be taken away from its mother unless it is demonstrated that to leave the

child with its mother would jeopardize its welfare, both in a physical and in a moral sense.''

In the Weaver case the Court was considering custody of a young son. Parents of that child were sufficiently educated to realize the necessity for the training of a child in a way that would make a product capable to compete in the society in which he would find himself as an adult. In the case we are here considering there are two little daughters. If there is any parental preference in leaving a child or children with the mother or the father, as between a son or daughter, that under similar circumstances would have to be resolved in favor of the daughter.

We are not unmindful of the fact that the trial Court has a wide discretion in awarding custody of a child, and that the Appellate Courts will be slow to alter a discretionary decree fashioned by the trial Court, and particularly would this be true when a normal situation existed. In the case of Weaver v. Weaver, we do not even have a normal proceedings, because in that case at page 196, Tenn.App. Vol. 37, page 145 of 261 S.W.(2d), is found this statement:

''There was a partial hearing of this cause before the Chancellor and in the course of the proceedings the parties agreed upon a decree which awarded an absolute divorce, based on cruel and inhuman treatment, to the complainant, Maurice Weaver, and fixed the custody of the child born of the marriage of the parties, Max Weaver, as alternating each three months with each parent.''

So in the Weaver case we had a father agreeing to a specific decree with respect to the custody of the child

and from that agreed decree he later undertook to get a reversal by filing his petition seeking the absolute custody of the boy. In the instant case we have the father and the mother each contending for the custody of the children. It is clear from what the trial Court said that he had found that the mother would not be qualified to take care of these little girls under the conditions existing at the time that he heard the case and entered this decree in a nunc pro tunc manner, on March 8, 1963, though he left them with the mother until the end of the school term 1963.

In that order he was dealing with conditions existing in January when the case was first heard on January 15, 28, and 29 of 1963, for on March 8, 1963, he entered that nunc pro tunc decree as of January 15, 29, 1963. The final decree was entered during the summer vacation of the school in July 1963, after a hearing showing the decided improvement in the mother's condition, and in which the Court ordered a report made to him on the physical condition at the conclusion of the regular 1963-64 school term, or "in early June 1964", is indicative of the fact that the Court felt that her condition was much improved in July of 1963. Thus it appeared in counsels' argument in this court, though the record does not show, that the father had them with him, notwithstanding the fact that generally a decree is suspended pending an appeal.

We have come to the conclusion at the time the Court pronounced this decree he was in error. We think the children were being well cared for in July of 1963 in the home of the mother, which was, of course, in the same house with her parents, and with the record showing that their father stated he would have to have the help of his

parents in order to have a proper home for these children, and that each set of the grandparents had ample, convenient and modern homes to care for these children and were abundantly willing to do so. Therefore there is much difference between the facts of the Weaver case and the case before us because in the Weaver case the whole matter was agreed to relative to divorce as well as custody of the children for after hearing the proof in this case contested from every angle, the Court found that the father had been guilty of cruel and inhuman treatment toward the mother of these children and with the condition that existed in July of 1963, as shown by this record, he should have awarded the custody of these children for a much greater part of the time, to the custody of that improving mother.

Presuming that these children have been with their father since this case was heard in July 1963, presents a problem to this Court in directing a positive decree in the case. We feel, however, that the father should have had some custody of the children some part of the vacation period between the schools but that the mother should have had the custody of these children during their tenure in school with certain rights of visitation and association by the father, and to make a decree as definitely as we can at this particular time, we feel that with the conditions existing with which we have to deal, which are those shown to be effective in July 1963, the mother should be awarded the custody of these children for the period beginning one week before the beginning of each annual school term following each summer vacation, and remain with her during that week and the entire school year, with the rights of the father to have them with him as hereinafter set out, and this custody should

continue until these children are at least a few years older, unless the condition of the mother becomes such that she can not direct the control over them as she lives with them in the home of her parents.

So it is our decree that the order of the trial Judge be reversed and modified to provide that the custody of the children be committed to their mother from one week before the end of the summer school vacation during each year until one week after the school term has ended during the spring; that period the father may have them with him for one week end each month, beginning with Friday after the school day is over and ending with the following Sunday not later than 5:00 o'clock P.M. and that the father may have the custody of these children during the summer vacation beginning one week after the end of the school for the summer vacation and keep them with him, predominantly in the home of his parents until one week before the end of such summer vacation. This will not mean that he should not take them to the usual summer resorts or outings so long as he is with them during each vacation period.

Neither does it mean that the order of the trial Court with respect to requiring a report upon the physical condition of the mother in June of 1964 shall be set aside.

In view of the fact that the law requires that the case be left on the docket of the trial Court for such determination as is proper with respect to the custody of the children, if conditions have changed, but the Court will be guided by this opinion unless he finds by proper proof that such conditions have changed before awarding custody of the children, in any way contrary to this opinion.

It is not meant by this opinion nor by the order of this Court to be entered based thereon, that the decree of the trial Judge is otherwise modified, in view of the fact that the appeal was only from that part of the decree granting the custody of the children to the father.

It is further our opinion that each parent should have the custody of the children during the Christmas holidays alternating each year.

Decree of this Court will be entered in accord with the foregoing opinion. The cost of this appeal in this Court will be paid by the appellee, Errette S. Bevins, and that all cost in the lower Court paid in accord with the judgment and decree of that Court as set out in its decree entered July 12, 1963, with all costs hereafter accruing in the trial Court to be adjudged by that Court in such decrees as may be made.

Carney and Bejach, JJ., concur.