IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE

# DONNIE SHAWN JULIAN v. LISA CAROL JULIAN

**Direct Appeal from the General Sessions Court for Putnam County**
**No. 0665D96     John B. Melton, III, Judge**

---

**No. M1997-00236-COA-R3-CV - Decided April 4, 2000**

---

This appeal involves a custody dispute over twin daughters born after their parents separated following a brief marriage. The father filed for divorce in the Putnam County General Sessions Court shortly after learning that the mother was pregnant, and the mother counterclaimed for divorce and for sole custody of the unborn children. Following a bench trial, the general sessions court granted the father a divorce based on the mother's inappropriate marital conduct, awarded the father sole custody of the children, and directed the mother to pay child support. On this appeal, the mother asserts that the general sessions court's decision interferes with her constitutional right to make primary care-taking decisions for her children, that she is comparatively more fit than the father to be the custodial parent, and that the general sessions court should have awarded joint custody. We have determined that the custody arrangement does not impermissibly interfere with the mother's parental rights and that the evidence fully supports the general sessions court's custody decision. Accordingly, we affirm the judgment awarding sole custody to the children's father.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the General Sessions Court Affirmed and Remanded**

KOCH, J., delivered the opinion of the court, in which TODD, P.J., M.S. and CAIN, J. joined.

Robert Todd Jackson, Nashville, Tennessee, for the appellant, Lisa Carol Julian.

William A. Cameron and Craig P. Fickling, Cookeville, Tennessee, for the appellee, Donnie Shawn Julian.

## OPINION

Donnie Shawn Julian and Lisa Carol Foust (Julian) began dating in January 1995. Mr. Julian, then twenty-seven years old, had obtained his GED after leaving high school in the tenth grade and was employed in Cookeville. Ms. Julian, who was twenty-five years old, had earned her baccalaureate degree and was working as a parole officer in the Sparta office of the Tennessee Board of Paroles. While they dated sporadically throughout 1995, their relationship was always harmonious. Mr. Julian was still conflicted about his relationship with a former girlfriend, and Ms.

Julian, without Mr. Julian's knowledge, was having sexual relationships with other men. One of these men was Ken McDonald, the manager of the office where Ms. Julian worked.

The parties eventually married on December 15, 1995. Two or three days before her wedding, Ms. Julian telephoned Mr. McDonald requesting one last fling before the marriage, and they met in Cookeville for their tryst. Ms. Julian, of course, did not mention this liaison to her husband-to-be. However, on the morning after her wedding, Ms. Julian began having doubts about the future of their marriage. In January 1996, she told Mr. Julian that "this just ain't going to work, I'm not happy."

In February 1996, Ms. Julian resumed having sexual relations with Mr. McDonald approximately twice a week. Mr. Julian suspected the affair, but Ms. Julian assured him that his suspicions were groundless. One month later, the parties learned that Ms. Julian was pregnant. Mr. Julian was pleased with the news, but he states that Ms. Julian was not. According to Mr. Julian, Ms. Julian stated that she wanted an abortion and that she did not want him around anymore. Accordingly, around March 20, 1996, Mr. Julian moved out of the parties' apartment into another apartment nearby.

The parties communicated infrequently after March 1996. For his part, Mr. Julian understood that Ms. Julian did not want him around, and so he communicated with her only when she called to ask him for assistance. For her part, Ms. Julian felt abandoned because Mr. Julian and his family did not take a greater interest in her pregnancy. Eventually, in April 1996, Mr. Julian filed for a divorce in the Putnam County General Sessions Court. He stated in his divorce complaint that Ms. Julian was pregnant and requested court-ordered blood tests and joint custody if the tests determined that he was the father.

Both parties instigated unsuccessful attempts at reconciliation. The last attempt occurred on May 22, 1996. On this occasion, Ms. Julian finally confessed that she was having sexual relations with Mr. McDonald and conceded to Mr. Julian that she was "infatuated" with Mr. McDonald. Mr. Julian recalled that Ms. Julian finally told him during this conversation that she wanted to be single and that she wanted a divorce. Approximately one week after this conversation, Ms. Julian filed a counterclaim seeking a divorce and sole custody of her unborn children.

Ms. Julian continued to work until two weeks before her expected due date. The Julians' twin girls were born on October 23, 1996. Mr. Julian and his family were at the hospital for the birth, and Mr. Julian visited the children and Ms. Julian while they remained in the hospital and also drove them home from the hospital. During the ensuing six weeks, Ms. Julian kept the children for thirteen days and nights. The infants spent the remainder of the time with Mr. Julian and his mother because, by this time, Mr. Julian had moved back into his parents' house.

Ms. Julian returned to work on December 2, 1996. She had already resumed having sexual relations with Mr. McDonald, although she asserted at trial that these encounters were not as consensual as their pre-marital relationship. Feeling overwhelmed by her predicament, Ms. Julian asked Mr. Julian to meet her on December 3, 1996 at her apartment. When Mr. Julian arrived, he

found Ms. Julian crying and distraught. Ms. Julian told Mr. Julian that she was having a difficult time juggling her responsibilities to the children and to her work and that she could not continue to rely on assistance from her mother and grandmother because they lived so far away. According to Mr. Julian, Ms. Julian finally told him "I don't want the responsibility" and "you've always wanted kids, there they are."[1] Mr. Julian attempted to console Ms. Julian and offered to help her with her bills, but he eventually left with the children. When he returned a short time later to Ms. Julian's apartment to collect the children's things, Ms. Julian only asked Mr. Julian what his family thought of her. Mr. Julian also recalled that Ms. Julian was upset because she had heard that Mr. McDonald had gone out with another woman while at a Nashville meeting and that she said "I am so in love with Ken McDonald . . . I'm going to do anything to get him."[2]

Ms. Julian saw the children only seven times between December 3 and December 28, 1996. She had her last sexual liaison with Mr. McDonald on Christmas Eve. On December 28, 1996, Ms. Julian went to Regina Schubert's house to "warn" her about Mr. McDonald. Ms. Schubert had also been dating Mr. McDonald for several years and had a personal dislike for Ms. Julian. The next day, Ms. Schubert and Ms. Julian got into a violent physical altercation at Ms. Julian's office. After the police were called, Ms. Julian asserts that Mr. McDonald pulled her aside and warned her not to file charges against Ms. Schubert and told her that he did not want to see her anymore and that she should find another job. When she returned home that evening, Ms. Julian consoled herself by smoking some marijuana with some friends.[3]

The Julians had another confrontation on February 4, 1997, at Mr. Julian's mother's home. Ms. Julian was upset that Mr. Julian would not agree to pay the $3,300 debt on their furniture as part of the divorce proceedings. She became even more upset when Mr. Julian's mother told her that the children's pediatrician had suggested taking them off formula and putting them on milk because she felt that she should be the one to make these decisions. Ms. Julian insisted that she was going to take the children with her. She left after Mr. Julian and his mother refused to turn over the children to her. The following day, Mr. Julian obtained a temporary restraining order preventing Ms. Julian from interfering with his custody of the children or from attempting to remove the children from his custody. Ms. Julian, on the advice of counsel, did not contest this restraining order. Instead, the Julians, through their lawyers, agreed to permit Ms. Julian to exercise visitation every other weekend from Friday through Monday.[4]

---

[1] Ms. Julian could not recall making these statements but did not deny making them.

[2] Ms. Julian denied making that statement to Mr. Julian on December 3, 1996.

[3] Ms. Julian conceded that she had smoked marijuana in high school but also insisted that she did not use it regularly. She admitted smoking marijuana on December 29, 1996.

[4] During the visitation negotiations, Ms. Julian stated that she planned not to work on Friday and Monday when the children were visiting in order to spend more time with them. As it turned out, Ms. Julian intended to take time from work only if she had accumulated sick and annual leave.
(continued...)

Ms. Julian's domestic difficulties were complicated by the aftereffects of her relationship with Mr. McDonald. Following her violent encounter with Ms. Schubert, Ms. Julian lodged a sexual harassment complaint against Mr. McDonald. She and Mr. McDonald had several unpleasant confrontations between February 1997, when Mr. McDonald accused Ms. Julian of following his automobile and trying to run him off the road, and the August 1997 divorce trial. Ultimately, the Board of Paroles demoted and transferred Mr. McDonald to Chattanooga and reprimanded Ms. Julian for not being truthful during the investigation of her complaint.

The divorce trial was held in August 1997. In addition to the Julians, the general sessions court heard accounts of the Julians' conduct during their brief, unhappy marriage from Mr. McDonald, Ms. Schubert, Mr. Julian's mother, a public health nurse who had assisted Ms. Julian during her pregnancy, and one of Ms. Julian's friends.[5] The parties also stipulated that Ms. Julian's mother, grandmother, and another friend would attest to her parenting skills and good character if called to testify. After both parties rested, the general sessions court awarded Mr. Julian a divorce on the ground of inappropriate marital conduct. The general sessions court also gave Mr. Julian sole custody of the parties' children and directed Ms. Julian to pay $225 per month in alimony. Finally, the general sessions court admonished both parties to refrain from speaking ill of each other in front of the children and from entertaining overnight guests of the opposite sex while the children are present. Ms. Julian has appealed the custody decision.

## II.
### INTERFERENCE WITH MS. JULIAN'S PARENTAL RIGHTS

Ms. Julian's first argument is that the custody award infringes upon her fundamental rights, as a biological parent, to the care and custody of her children. She argues that the general sessions court's custody order was, in effect, a "constructive award of custody" to Mr. Julian's mother. Based on this premise, she asserts that her rights as a biological parent are superior to those of Mr. Julian's mother and that she cannot be deprived of her children without some showing that some harm will befall them if they were placed in her custody.

### A.

---

[4](...continued)
Accordingly, after she exhausted her leave, the child spent most of Friday and Monday with their grandmother or great-grandmother because Ms. Julian was at work.

[5]Ms. Julian's friend testified that she was a lesbian. To rebut other testimony concerning Ms. Julian's sexual preferences, both Ms. Julian and her friend categorically denied that they had any sort of physical relationship.

Biological parents have a fundamental liberty interest in the care and custody of their children that is protected by both the state and federal constitutions. *See Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 1394-95 (1982); *In re Swanson*, 2 S.W.3d 180, 187 (Tenn. 1999); *O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn. Ct. App. 1995). These rights are superior to the rights of third-parties. *See Stubblefield v. State ex rel. Fjelstad*, 171 Tenn. 580, 587-88, 106 S.W.2d 558, 561 (1937); *Doles v. Doles*, 848 S.W.2d 656, 660 (Tenn. Ct. App. 1992). They are also protected from unwarranted governmental intervention. *See Simmons v. Simmons*, 900 S.W.2d 682, 684 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 579 (Tenn. 1993).

One circumstance that invites, and indeed requires, governmental intervention is divorce. Only the courts can dissolve a marriage. When called upon to do so, they must sort out and reorder the parties rights and obligations, *see Rust v. Rust*, 864 S.W.2d 52, 56 (Tenn. Ct. App. 1993), and often they must make decisions that would otherwise have been left to the parents themselves had they been able to make these decisions for themselves. *See Yeager v. Yeager*, No. 01A01-9502-CV-00029, 1995 WL 422470, at *3 (Tenn. Ct. App. July 19, 1995) (No Tenn. R. App. P. 11 application filed). In a divorce proceeding, the courts must strive to maintain a child's relationship with both parents, *see Helson v. Cyrus*, 989 S.W.2d 704, 707 (Tenn. Ct. App. 1998), and therefore, must devise custody and visitation arrangements that interfere with the child's relationship with both parents as little as possible. *See Aaby v. Strange*, 924 S.W.2d 623, 629 (Tenn. 1996); *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 484 (Tenn. Ct. App. 1997). However, as important as a parent's rights and interests are, they are secondary to the rights and interests of their children. *See Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997); *Doles v. Doles*, 848 S.W.2d at 661.

**B.**

Notwithstanding Ms. Julian's characterization of the custody decision as a "constructive award" of custody to Mr. Julian's mother, the general sessions court awarded sole custody to Mr. Julian. Thus, for all legal purposes, he and he alone is the legal custodian of the parties' children, and he and he alone is responsible for their care and upbringing. With prerogatives of sole custody come parental responsibilities, and in the eyes of the law, the buck stops with Mr. Julian.

The fact that Mr. Julian, as a single parent, will receive assistance from his mother is neither surprising nor inappropriate. The child custody statute recognizes that the stability of a parent's family unit is a factor to consider in making a custody decision. *See* Tenn. Code Ann. § 36-6-106(4) (Supp. 1999). Courts making custody decisions frequently consider the amount of assistance and support the parties can reasonably expect to receive from their extended families. *See Adelsperger v. Adelsperger*, 970 S.W.2d at 486; *see also Hale v. Hale*, No. 03A01-9809-PB-00284, 1999 WL 667276, at *5 (Tenn. Ct. App. Aug. 24, 1999) (Tenn. R. App. P. 11 application filed Oct. 25, 1999); *Yeager v. Yeager*, 1995 WL 422470, at *7; *Salimbene v. Salimbene*, No. 87-194-II, 1987 WL 27748, at *2 (Tenn. Ct. App. Dec. 16, 1987) (No Tenn. R. App. P. 11 application filed).

The trial court has awarded Ms. Julian "liberal" visitation, and this visitation will enable Ms. Julian to maintain her parental relationship with her daughters. The record contains no evidence that either Mr. Julian or his mother will interfere with her exercise of these rights. If they do, she may return to court to request a modification of the custody arrangement under Tenn. Code Ann. § 36-6-

106(10). Accordingly, we find no basis for concluding that the general sessions court's custody and visitation arrangement in this case inappropriately interferes with Ms. Julian's parental rights.

## III.
### THE COMPARATIVE FITNESS OF THE PARTIES

Ms. Julian also asserts that the general sessions court's comparative fitness analysis was flawed and that the evidence supports finding that she is comparatively more fit to be the custodial parent. We have determined that the evidence does not preponderate against the general sessions court's conclusions.

### A.

Decisions involving custody and visitation are among the most important decisions confronting courts in divorce cases. The courts must strive to devise custody arrangements that promote the development of the children's relationship with both parents and interfere as little as possible with post-divorce family decision-making. *See Aaby v. Strange*, 924 S.W.2d at 629; *Taylor v. Taylor,* 849 S.W.2d 319, 331-32 (Tenn. 1993). These decisions are not intended to reward or to punish parents, *see Turner v. Turner,* 919 S.W.2d 340, 346 (Tenn. Ct. App. 1995); *Barnhill v. Barnhill*, 826 S.W.2d 443, 453 (Tenn. Ct. App. 1991). Their goal is to promote the children's best interests by placing them in an environment that will best serve their physical and emotional needs. *See Luke v. Luke,* 651 S.W.2d 219, 221 (Tenn. 1983).

No hard and fast rules exist for determining which custody and visitation arrangement will best serve a child's needs. *See Taylor v. Taylor,* 849 S.W.2d at 327-28; *Dantzler v. Dantzler,* 665 S.W.2d 385, 387 (Tenn. Ct. App. 1983). The inquiry is factually driven and requires the courts to carefully weigh numerous considerations. *See Nichols v. Nichols,* 792 S.W.2d 713, 716 (Tenn. 1990); *Rogero v. Pitt,* 759 S.W.2d 109, 112 (Tenn. 1988). Among these considerations are:

> the age, habits, mental and emotional make-up of the child and those parties competing for custody; the education and experience of those seeking to raise the child; their character and propensities as evidenced by their past conduct; the financial and physical circumstances available in the home of each party seeking custody and the special requirements of the child; the availability and extent of third-party support; the associations and influences to which the child is most likely to be exposed in the alternatives afforded, both positive and negative; and where is the greater likelihood of an environment for the child of love, warmth, stability, support, consistency, care and concern, and physical and spiritual nurture.

*Bah v. Bah,* 668 S.W.2d 663, 666 (Tenn. Ct. App. 1983); *see also* Tenn. Code Ann. § 36-6-106.

The comparative fitness analysis is not intended to determine which party has been perfect because perfection in marriage is as uncommon as it is elsewhere. *See Rice v. Rice*, 983 S.W.2d 680, 682-83 (Tenn. Ct. App. 1998). Courts understand that parents competing for custody have their own virtues and vices. *See Gaskill v. Gaskill*, 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996). Accordingly, they do not expect a parent to prove that he or she is perfect, *see Bah v. Bah,* 668 S.W.2d at 666; *Edwards v. Edwards,* 501 S.W.2d 283, 290-91 (Tenn. Ct. App. 1973), or that the other parent is completely unfit. *See Griffin v. Stone,* 834 S.W.2d 300, 304-05 (Tenn. Ct. App. 1992); *Harris v. Harris,* 832 S.W.2d 352, 353 (Tenn. Ct. App. 1992). Instead, they analyze the "comparative fitness" of the parents to determine which of the available custodians is comparatively more fit than the other. *See In re Parsons,* 914 S.W.2d 889, 893 (Tenn. Ct. App. 1995); *Bah v. Bah,* 668 S.W.2d at 666.

The courts have emphasized the importance of continuity of placement in custody and visitation cases because of the importance of stability to children's well-being. *See Taylor v. Taylor,* 849 S.W.2d at 328; *Contreras v. Ward,* 831 S.W.2d 288, 290 (Tenn. Ct. App. 1991). Continuity, however, does not trump all other considerations. *See Gaskill v. Gaskill*, 936 S.W.2d at 630. Depending on the facts of the case, a parent who has been a child's primary care giver may not necessarily be comparatively more fit than the other parent to have permanent custody of the child.

Custody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves. Accordingly, appellate courts are reluctant to second-guess a trial court's decisions. Trial courts must be able to exercise the broadest possible discretion in these matters, but they still must base their decisions on the proof and upon the appropriate application of the applicable principles of law. *See D v. K*, 917 S.W.2d 682, 685 (Tenn. Ct. App. 1995). Thus, we review these decisions de novo on the record with a presumption that the trial court's findings of fact are correct unless the evidence preponderates otherwise. *See Nichols v. Nichols,* 792 S.W.2d at 716; *Doles v. Doles*, 848 S.W.2d at 661.

**B.**

Both parties' human frailties are evident in this record. They were not emotionally ready for marriage and plainly could not find the commitment needed to maintain their relationship when it began to sour almost immediately after their wedding. It should have been no surprise that their relationship disintegrated in less than four months. Had it not been for their daughters, the Julians would most likely have moved on with their lives without giving their marriage much thought. However, their brief union produced two children – now over three years old – who have indelibly altered their parents' lives. These children are now at the center of this custody dispute.

We do not find that Ms. Julian is unfit to be a custodial parent. However, after weighing the parties' personal attributes, parental commitment, family stability, and the resources they have made available for the children, we concur with the trial court's conclusion that Mr. Julian is comparatively more fit. He has maintained stable employment. He does not drink alcohol or use illegal drugs. He has excellent support from his immediate family who live in the area. He has provided satisfactory surroundings for the children, and he has demonstrated an interest and ability

to care for them. Neither Mr. Julian nor his mother have interfered with Ms. Julian's visitation with the children, and Ms. Julian herself has conceded that the children have fared well during the time they have been in Mr. Julian's custody.

Ms. Julian has not demonstrated similar stability or emotional maturity. She carried on a sexual affair with her supervisor. She decided on the day after her wedding that her marriage had been a mistake. She had a physical altercation with her superior's girlfriend. She used illegal drugs on at least one occasion and may have abused prescription drugs. She carried on a combative relationship with her supervisor after their sexual liaison ended. During the three months after the birth of her daughters, she demonstrated that she was unable to shoulder her responsibilities at work and at home. To her credit, Ms. Julian began to take control of her life after her supervisor was transferred to another office. She has returned to school to obtain an advanced degree and is currently living on campus in student housing. She is also continuing to work. A psychologist consulted in preparation for trial testified that Ms. Julian had tolerated the stress between 1995 and 1997 remarkably well. He also observed that her composure has improved and that she has a clean bill of mental health.

We have no doubt of the genuineness of Ms. Julian's love for the parties' children. Given the present state of affairs, she may very well be capable of assuming the responsibilities of a custodial parent. But this improvement in her circumstances is insufficient, by itself, to alter the existing custody arrangement. Custody should not be changed simply because the non-custodial parent has become better equipped to have custody. The considerations of stability and continuity of placement dictate that custody be changed only when the existing custody and visitation arrangement is no longer in the children's best interests. All parties, including Ms. Julian, have agreed that the children have thrived since December 1996 when they began living with Mr. Julian and his mother. Without some evidence that current custody and visitation arrangement is not serving the children well, we have no basis to overturn the general sessions court's custody and visitation decision.

## IV.
### MS. JULIAN'S REQUEST FOR JOINT CUSTODY

Finally, Ms. Julian faults the general sessions court for not granting the parties joint custody of their children. She asserts that joint custody was an available option but that the general sessions court must not have considered it because it made no findings regarding the suitability of joint custody. Based on the facts of this case, we decline to conclude that the general sessions court did not appropriately consider all available custody options simply because it did not discuss the joint custody alternative.

### A.

Based on experience, the courts have been less than optimistic about the success or benefit of joint custody arrangements. Accordingly, even though Tenn. Code Ann. § 36-6-101(a)(1) (Supp. 1999) has for some time provided a joint custody alternative, the courts have been reluctant to

impose joint custody when both parties have not agreed to it or in cases where the physical or other circumstances of the parties render joint custody unworkable.  *See Gray v. Gray*, 885 S.W.2d 353, 354 (Tenn. Ct. App. 1994); *Malone v. Malone*, 842 S.W.2d 621, 623 (Tenn. Ct. App. 1992); *Barnhill v. Barnhill*, 826 S.W.2d 443, 454 (Tenn. Ct. App. 1991); *Garner v. Garner*, 773 S.W.2d 245, 248 n.3 (Tenn. Ct. App. 1989); *Dodd v. Dodd*, 737 S.W.2d 286, 289 (Tenn. Ct. App. 1987).

In 1996, the General Assembly amplified its view of joint custody.[6]  It provided that joint custody will be presumed to be in a child's best interest only when the "parents have agreed to joint custody or so agree in open court at a hearing for the purpose of determining the custody of the minor child."  Tenn. Code Ann. § 36-6-101(a)(2).  In all other circumstances, there exists "neither a preference nor a presumption for or against joint legal custody."  Tenn. Code Ann. § 36-6-101(a)(2).  The courts still retain the "widest discretion" to fashion custody arrangements that are in a child's best interests and, when the parents have agreed on joint custody, may conduct its own investigation to determine whether joint custody is appropriate.  *See* Tenn. Code Ann. § 36-6-101(a)(2).

## B.

At no point in these proceedings have the Julians agreed to joint custody.  While Mr. Julian requested joint custody in his original complaint, Ms. Julian sought sole custody in her counterclaim.  By the time this case came to trial, it was clear that neither party was pursuing joint custody.  Their cases were hostile and deeply personal.  Neither lawyer proposed joint custody in opening or closing arguments. Rather, Mr. Julian's trial strategy was to mount a frontal assault on Ms. Julian regarding her morals, sexual preferences, veracity, and commitment to her children.  On the other hand, Ms. Julian's strategy was to accuse Mr. Julian and his mother of "concocting lies" to take the children from her and of "flimflaming" her into believing that she would get the children back "when her life . . . cleared up a little bit."

The general sessions court was not required to presume that joint custody was the preferred option in this proceeding because the parties were not jointly requesting it.  In the absence of the parties' agreement on joint custody, the general sessions court had no reason to make specific findings regarding joint custody or to direct an independent investigation into the suitability of joint custody.  In the absence of a joint request by the parties for joint custody, we decline to conclude that the general sessions court erred by not ordering a joint custody arrangement in this case.

## V.

We affirm the judgment granting Mr. Julian sole custody of the parties' two children and remand the case to the trial court for whatever further proceedings may be required.  We also tax the costs of this appeal to Lisa Carol Foust Julian and her surety for which execution, if necessary, may issue.

---

[6]*See* Act of Apr. 25, 1996, ch. 1046, 1996 Tenn. Pub. Acts 848.