# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
October 5, 2010 Session

## IN RE BEVIN H.

### Appeal from the Circuit Court for Blount County
### No. L-15676    W. Dale Young, Judge

_____

### No. E2009-02485-COA-R3-CV - FILED DECEMBER 29, 2010

_____

This is a case regarding the custody of a minor female child, Bevin H. (DOB: Dec. 19, 2001) ("the Child"). The Child was born to Randy H. ("Father") and his wife. Tragically, the Child's mother died two days after the Child was born. Shortly thereafter, the Child's paternal aunt, Rhonda H. ("Aunt") and her husband, became the Child's primary caregivers. Aunt[1] sought custody, alleging that the Child was dependent and neglected in Father's care. During the pendency of the custody case, the Child was taken into state custody based on evidence that she had been sexually molested. The Child was released to Father and Aunt under an agreed shared parenting plan before the parties filed competing custody petitions. Following a hearing, the juvenile court granted Aunt custody of the Child upon finding that the Child faced a risk of substantial harm if left in Father's custody. Father was granted supervised visitation with the Child. Father appealed to the trial court. In a two-sentence decision, with no findings of fact, the trial court reversed and placed full custody of the Child with Father. Aunt appeals. We reverse.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed; Case Remanded

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which HERSHEL P. FRANKS, P.J., and JOHN W. MCCLARTY, J., joined.

Lance A. Evans, Maryville, Tennessee, for the appellants, Rhonda H. and Keith H.

Wayne Decatur Wykoff, Knoxville, Tennessee, for the appellee, Randy H.

---

[1]The Aunt and her husband jointly sought custody. For ease of reference, we will usually only refer to the Aunt.

Heather Inman, Knoxville, Tennessee, guardian ad litem for Bevin H.[2]

**OPINION**

I.

Just after the Child's birth, Father and the Child lived with Connie H., ("Grandfather"), who is the father of Father and Aunt. A few weeks later, Father and the Child left and moved in with the Child's paternal grandmother, Wanda W. ("Grandmother W.").[3] Although Father never "asked" Aunt to keep the Child, she began doing so after Grandmother W. was unable to continue to care for the Child by herself. Quicky, it developed that Grandmother W. cared for the Child in the mornings until Aunt picked her up after work each afternoon, took her home for the night, and brought her back the next morning. At the time, Aunt was working for a tanning salon owned by Grandfather. Grandmother W. said that Father worked "a lot" and frequently traveled so Aunt took care of the Child. Aunt said it simply came down to "somebody had to watch her" and Father was not there. After Father got his own place to live, the same childcare arrangements continued. Aunt said Father never asked to keep the Child overnight and did not begin to "co-parent" the Child until she was a year old. Aunt said that throughout the Child's infancy while she cared for the Child with Grandmother W.'s help, Father rarely visited, provided no financial support for the Child, and even retained the social security survivor benefits the Child received as a result of her mother's death.[4]

In December 2002, Aunt petitioned for custody immediately after Father first took physical custody of her. Aunt alleged that Father, "in the last couple of days," had begun to take the Child home with him at night and that the Child was dependent and neglected as a result of Father's unfitness and inability to care for her. In particular, Aunt cited Father's lack of visitation, failure to provide any financial support, anger management issues, financial instability, and failure to provide the Child with necessary medical care. As to the latter ground, Aunt noted an incident earlier that summer when she took the Child to the hospital because she appeared to have trouble breathing or swallowing. According to Aunt, the treating physician recommended that the Child be admitted for further care and

---

[2]The guardian ad litem, Ms. Inman, has filed a statement in which she, on behalf of the Child, supports Aunt's position on appeal and adopts the brief Aunt has filed.

[3]Grandfather and Grandmother W. were never married.

[4]In July 2006, Father was ordered to pay to Aunt the Child's social security benefits he had received since February 2006.

evaluation, but this required Father's consent. Father was notified and came to the hospital, visibly angry, refused treatment for the Child and demanded that the Child be discharged after announcing that he could do as he wished with "his" child and there was nothing wrong with her except allergies.[5] Father inexplicably blamed the visit on the Child's maternal grandmother, Soula T. ("Grandmother T."), who was not present; Father began yelling that he "could kill her." Other relatives who had gathered at the hospital corroborated Aunt's account of the incident. Grandmother W.'s husband, Kenneth W., said that Father expressed anger that he had "already spent $1,300" on the Child's visit and said he was taking her home. Notably, however, the Child went home with Aunt that night while Father left with his soon-to-be third wife. Aunt's amended petition alleged that removing the Child from her care and allowing her to remain with Father would cause "serious, emotional harm" to the Child.

In a February 3, 2003 order, the juvenile court referee ordered that custody would remain with Father and set regular visitation with Aunt (but with "no presumption of a right to visitation" by Aunt) pending a final custody hearing. In addition, Father was ordered to undergo therapy for anger management, grief, and parenting issues, and he and his new wife, Missy H., were ordered to attend parenting classes. While the Child was in Father's custody, Aunt filed a petition for contempt predicated on Father's failure to allow her court-ordered visitation. Aunt was ultimately granted several weeks of "make-up" visitation time with the Child.

In March 2003, Aunt received the Child from Father for a scheduled weekend visit. When Aunt tried to change her diaper, the Child uncharacteristically cried, pulled up her knees, and strenuously resisted. Aunt noticed a red, burn-like abrasion in the Child's genital area and took her to the hospital. Upon examination, the treating physician found that the Child's injury was consistent with sexual molestation, reported the matter, and released the Child to Aunt's care.

Two days later, DCS took custody of the Child. Based on an immediate threat to the Child's safety, DCS averred that it was contrary to the Child's best interest to remain in the custody of either Father or Aunt pending a custody determination. The permanency plan developed for the Child including goals of returning her to Father or placing her with a relative in the event that placement with Father proved inappropriate. The plan provided for four hours of supervised visitation a month with Father, but did not provide visitation with Aunt or otherwise involve her.

---

[5]Aunt testified that the Child was subsequently diagnosed as suffering from R.S.V., a condition that required prescribed breathing treatments.

Two psychologists, Dr. Kathryn Flagler and Dr. Worley Fain, performed a custody evaluation between March and April 2003. Dr. Flagler interviewed all of the parties and many family members and observed the Child. In summary, she found Father to be fit and capable of parenting the Child, especially in view of the "calming effect" she found that Missy H. had on Father. Dr. Flagler stated that Missy H.'s presence "alleviates any concern for me about [the Child's] physical well being." Dr. Flagler did express concern "about [Father's] unusually long list of enemies," "the reports of a hot temper, of credit card fraud, of spouse abuse, and sibling abuse" but noted that no charges were filed against him and that "having a hot temper does not disqualify people from parenthood." In speaking with Father, Dr. Flagler found him to be "straightforward" and "controlled." Father told Dr. Flagler that he was "a mechanical engineer who is pursuing an MBA degree in management at Landsbridge University, which is part of Vanderbilt." Father was "quite angry" about the situation with the Child. He reported that the custody battle with Aunt began when he had tried to take the Child for planned weekend visits, but found it hard to do so because he felt that Aunt and Grandmother W. were actively hiding the Child from him. He denied molesting anyone and suggested Aunt's accusations and custody petition were "all motivated by money." As to Aunt, Dr. Flagler found that she was genuinely concerned about the Child and wanted to raise her, but also found her "hatred of [Father] readily apparent." She observed that Aunt scored "very high on the Lie scale with a tendency to minimize her own faults. . . ."

Dr. Fain evaluated Father and found him to be free of mental defect or disorder. He concluded that nothing in his evaluation gave him any indication that Father was "not fully capable of caring for [the Child]," then 15 months old. As background information, Father reported that the custody dispute and issue of his parental fitness arose "after [Grandmother W. and Aunt] provided care for [the Child] over a period of weeks while he was working out of town." Father expressed "anxiety and frustration" about Aunt and her husband having visitation with the Child. The results of the personality testing Dr. Fain performed "scored [Father] as a person who accepts consequences, is dependable and trustworthy," and were characteristic of a person "who emphasizes harmony with other people."

At the end of July 2003, Aunt sought an order compelling DCS to place the Child with her or another suitable relative pending further disposition of the Child's case. Aunt noted that the Child had been denied contact with her for nearly five months and averred that continuing to leave the Child in foster care "can be nothing but traumatic and harmful for [her] well-being" considering the available alternatives.

In September 2003, the Child left DCS custody under an agreed permanent parenting plan which provided for equal parenting time with Father and Aunt and designated Father as the primary residential custodian. The arrangement was short-lived – Father and Missy

H. divorced in November 2003, he married Elizabeth H., his fourth wife, in May 2004, and moved to Nashville. He sought full custody of the Child based on his contention that his changed circumstances required that he be awarded sole custody. In response, Aunt renewed her custody petition.

In March 2005, the juvenile court, on its own motion, restrained Father from contact with the Child and made Aunt the Child's primary custodian. In support of its decision, the referee found "that the Child has made disclosures of abuse to various persons including the guardian ad litem." Father subsequently moved for a new parenting plan and then custody, noting that he had been denied contact with the Child based on allegations of abuse that had subsequently been deemed "unfounded" by DCS. In August 2005, the referee lifted the restraining order against Father after concluding that "there were not sufficient facts" to continue the order.

In May 2006, the juvenile court concluded its custody hearing. In its July 2006 final order, the juvenile court awarded full custody of the Child to Aunt based upon its finding that placing her in Father's custody would subject her to a risk of substantial harm. We quote extensively from the juvenile court's order:

> [T]he Court finds by clear and convincing evidence, while acknowledging and applying the presumption of [Father] over any third party, that in applying the substantial harm test . . . , to change the residential arrangements for [the Child] from [Aunt's] home to [Father's] home would be devastating to [the Child] and would result in a danger of substantial harm to her. The Court finds that to give [Father] custody of [the Child] at this time would produce substantial emotional harm for her future and would put her at risk, preventing her from becoming a healthy productive adult. The Court finds that it would be in the best interest of [the Child] to remain in the custody of [Aunt].
>
> The Court finds that [the Child] would be in danger of substantial harm based on evidence: That [Father] used his [other] child, Lauren [H.], by having her lie to the Social Security Administration in an attempt to defraud the federal government; . . . that [Father] has anger management issues; that [Father] has a history of financial instability (as evidenced by frequent job changes and twice filing for bankruptcy in the recent past and reliance on wives to support him financially);

that [Father] is a prevaricator and lies frequently to satisfy his own selfish interests and is not to be believed by the Court (the Court finds that [Father] has little if any credibility and highly questionable morality, noting the use of his daughter . . . in his attempt to defraud the federal government and achieve his own wants and desires); that [Father] is not stable in his relationships as evidenced by his tumultuous marital history; that [Father] had already failed to financially contribute to the care of [the Child], except for very meager amounts, while taking [the Child's] Social Security benefits for his own use for the majority of [the Child's] life; that [Father] by his own admission, had fraudulently obtained and used credit cards in other persons['] names; that [Father] had lied to Worley Fain, PhD, and Katy Flagler, PhD, during separate assessments of [Father], and that if [Father] had not misled them, their reports would have been different had they known all the facts.

The Court further finds that [the Child] has been touched, but cannot find by clear and convincing evidence that [Father] had done the repeated touching as claimed by [the Child].

Based on the foregoing, the juvenile court ordered, in relevant part, as follows:

1. That [Aunt] shall have legal and physical custody of [the Child], being designated as the primary residential custodian[], with authority to consent to . . . any . . . care as may be needed.

2. That, as a temporary measure pending further orders of the Court, [Father], shall have visitation with [the Child] on the first, third and fifth weekends of each month . . . said visitation to, at all times, . . . be in the presence of [Elizabeth H.], wife of [Father].

3. That the parties shall attempt to reach an agreement regarding [Father's] visitation.

4. That [Father] is to forthwith provide to [Aunt] . . . the Social Security funds ($729.00 per month) he has received after 2/17/06 on behalf of [the Child] . . . (Noting that [counsel] does

-6-

not have those funds in his trust account, [Father] testifying that
he had set those funds aside in a personal bank account).

(Parenthetical information in original).

In December 2006, Father unsuccessfully moved for relief from the juvenile court's judgment – he claimed that his admittedly "flawed character" did not make him an unfit parent or pose any harm to the Child. Father appealed the juvenile court's decision to the trial court and moved to decrease the amount of his child support obligation based on his asserted job loss and new work at a "drastically decreased" pay rate. Specifically, Father asserted that "to no fault of his own" his employment with Southern Land Company was "abruptly terminated . . . without proper notice or explanation," forcing him to work for his wife's construction company at less than half his former salary.

The custody hearing in the trial court began in August 2007 and was heard over some seven days. By the time the hearing concluded in November 2009, the Child was nearly nine and had been in Aunt's custody for the past three years. We summarize the evidence presented.

In 2006, clinical psychologists Dr. Lance Laurence and Dr. Catherine Grello completed a court-ordered child custody evaluation that included the Child, then four, Aunt and her husband, and Father and his wife, Elizabeth H. Dr. Laurence noted that the case "was characterized by a great deal of 'he said, she said' kinds of situations in which there is all kinds of conflicting testimony and reports highly contentious over time." Beyond question, however, Aunt had been the Child's primary caregiver since she was "very, very young."

Dr. Laurence noted that after the initial finding of sexual abuse by an "unknown perpetrator," there were further allegations in 2005 and in November 2006 that Father had inappropriately touched the Child.

Asked about placing the Child with Father, Dr. Laurence stated:

> In our conclusion, our basis of doing this report is that we
> strongly urge that the [C]hild be with [Aunt and her husband] in
> the primary home. [Father], with all due respects, just has a very
> checkered history of emotional instability, financial instability.
>
> [I]n the end, one of the pieces of data that we used that was
> really quite diagnostic came from [Father] himself. It didn't

come from any other party. It didn't come from the wife. It did not come from [Aunt] or [her husband] or the grandparent or a psychologist . . . . It came from his own reports on the . . . probably the oldest and most standard psychological test used, . . . the MMPI. . . .

By his own words and nobody else's answers, his is the only profile of all these adults that is clinically significant. And it is clinically significant on paranoid and anti-social personality dimensions.

Individuals with this . . . profile tend to be chronically maladjusted. The client is apparently immature and self-indulgent, manipulating others for his own needs. He may behave in an obnoxious, hostile, and aggressive way, and he may rebel against any authority figures.

Despite these difficulties with others, he refuses to accept responsibility for his problems. He may have an exaggerated or grandiose idea of his own capabilities or personal worth. He is likely to be humanistic and may overuse alcohol or drugs. He appears to be quite impulsive and may act out against others without considering the consequences.

He is also likely to be suspicious, aloof, and unapproachable. Paranoid features and externalization of blame are likely to be present in this clinical profile.

Counsel questioned Dr. Laurence about his conclusions as follows:

Q: And the information you picked up in your clinical interviews and discussions with people, did that support what the MMPI said?

A: Fully. And the thing that becomes most important about this after we have all the other information, his own self-report confirms what everybody has said about him.

In short, Dr. Laurence concluded that Father had "a personality disorder. It is a character disorder." Asked whether any specific harm would be posed to the Child if she

were raised by someone with the paranoid, anti-social personality disorder he had diagnosed in Father, Dr. Laurence stated:

> Well, it has to do with the stability of the home . . . and the quality of the parenting. . . . [Such people] tend to not be able to provide a stable home situation relative to other people and they tend not to provide as good a parenting as you might want, because the parenting oftentimes rotates less out of the need of where the kid is coming from and more out of their own sort of narcissistic positions.

Elizabeth H. testified before the trial court. She stated that when she first married Father, he lied about his third marriage and led her to believe he had an engineering degree from UT. She was also unaware of his debt situation and his problems with credit card use or his two bankruptcies. She said she became worried about herself. As a result, Elizabeth H. divorced Father after five months, but they continued to see each other. She eventually forgave Father and remarried him in May 2005. Dr. Laurence found Elizabeth H. to be a "more dependent, depressive individual. She is vulnerable to being a victim, to not standing up for herself to being taken advantage of." At the same time, he saw Elizabeth H. as "a plus in this situation . . . because . . . she would try to watch [the Child], she would try to do good. . . ."

Regarding the continued sexual abuse allegations, Dr. Laurence noted that the history of accusations and the Child's young age made it impossible to determine whether anything did or did not happen to the Child. The first report after a formal investigation by DCS was concluded as "incident occurred, perpetrator unknown." He explained, "[o]ur position was there sure is a lot of allegations about this and it would be useful to have somebody hanging around to just kind of monitor, just to make sure this little girl will be okay. . . ." He added that "if we thought [Father] was that awful, we would not have gone ahead and recommended visitation. . . ." Whether visits with Father would have a "significant impact" on the Child's development, Dr. Laurence opined that it depended on how the visits went:

> She did tell me that [she] gets scared on the visits; okay? Now, I don't know what that means; okay? She didn't say anymore about that. Hopefully, the visits will go well.

Again, Dr. Laurence viewed Elizabeth H. as a "positive force if the marriage held," and based his recommendation of additional visitation time with Father on her presence.

Aunt reported that she was physically abused by Grandfather and had run away from home as a teenager. She also testified that Father had molested her when she was twelve. Aunt also reported that Father was physically abused by their mother's second husband and that Father had been abusive towards his first two wives, which allegations Father denied. Dr. Laurence found Aunt to be "frank and honest" and noted that Aunt openly admitted to struggling with her own history of abuse. She acknowledged twice striking her former husband during their separation, but had since completed anger management classes and had not had further problems. Dr. Laurence concluded that Aunt was "not without faults" – she tended to show her temper when she feared something bad would happen and "likely embellishes her good qualities."

Drs. Laurence and Grello concluded in their 2006 report that the Child in Aunt and her husband's care "will thrive and has been thriving in [Aunt's] home." Dr. Laurence observed that his recent meetings with the Child in preparation for trial confirmed their conclusions. More specifically, Dr. Grello interviewed the Child in 2008 and 2009, when the Child was seven to eight. She found the Child to be well adjusted, active, and an above average student with many friends and no behavior problems. During their most recent meeting, Dr. Grello asked the Child about all her family members and how she got along with each of them. The Child reported that she and Elizabeth H. got along really well. However, when asked simply, "how do you get along with your dad," Dr. Grello observed that the Child "regressed quite a bit:"

> She curled up. It was very striking. She curled up, she hid her face, she put her thumb in her mouth. And then I could no longer understand what she was saying . . ."

Dr. Grello said after several minutes of trying to coax her to talk again, the Child said she did not want to answer the question. A short time later, the Child related that Father spanked her bottom when she was bad. The Child went on to tell Dr. Grello that Father "had touched her private." The Child elaborated that she was downstairs with Father and they were watching a movie, "Night at the Museum," when Father touched her and told her not to tell the neighbors. Dr. Grello noted that this was consistent with the Child's testimony in an earlier interview. Dr. Grello concluded that the Child believed that something had happened to her when she made these statements. Dr. Grello said the Child gave no indication that she had a "good time" with Father on their visits – the Child reported that "he was mean to her, that she gets scared, that he says mean things, and that she doesn't feel safe." Dr. Grello concluded that there was "something wrong" in the Father/Child's relationship and the multiple instabilities in Father's environment made it "not the healthiest for a child to be raised in."

Father stipulated that he was arrested in the present case in 2004 for custodial interference and in 2005 for failure to appear at a hearing related to his last divorce. He acknowledged a judgment was entered against him in 2007 for a $20,000 child support arrearage for his daughter from a previous marriage. Father admitted that he told multiple lies in order to obtain better jobs. On various employment applications, Father stated that he had graduated from Heritage High School, but had actually obtained his GED; that he had been a mechanical engineer rather than an assembly line worker; and that he attended the University of Tennessee and earned an engineering degree with a 2.9 or 3.2 grade point average, none of which was true.

Father said he had moved back to Nashville after he and Elizabeth H. married in May 2005. The record indicates that from 2001 to the time of the trial, Father worked at roughly 12 different jobs with some gaps in between jobs, most of which lasted a few months to a year. Most recently, according to his unemployment claim file, Father was terminated from his job at Southern Land Company in 2007 for "a series of incidents the employer felt displayed dishonesty and conflict of interest." Father testified he did not recall the reason he was fired.

Questioned about obtaining and using credit cards in other persons' names, Father denied that he committed credit card fraud and said that he could not recall admitting to such fraud in his testimony before the juvenile court. At this point, the Court ordered Father's testimony to end. The court stated:

> I'm going to do something I have never done in my life and never expected to do. And that is, I'm going to ask this witness to come down, because I don't believe a word of his testimony. He is an admitted liar. The courts have found him guilty of credit card fraud. Why should I believe a word he tells me? I think we are wasting time on him.

Investigator Mary Skeen had worked for DCS for two years and personally investigated two of the seven claims DCS received between March 2003 and June 2007 that Father had sexually or physically abused the Child. As to the first incident, when the Child was taken into custody, it was determined that the Child was abused by an unknown perpetrator; the remaining six reports were all determined to be "unfounded,"meaning that no evidence was found to confirm the alleged abuse. Skeen had visited the Child at Father's home and observed that she seemed happy and not uncomfortable around Father. Skeen had spoken to Aunt by telephone, but no one at DCS had ever met Aunt or her husband in the course of their investigations. In the end, DCS had no objections to Father being around the Child. DCS referred the Child to Terry Watkins, a forensic interviewer. Skeen was aware

-11-

that Watkins had concluded, as Skeen put it, that the Child had disclosed touching by Father that involved "more than just cleaning or wiping or . . . everyday care."

Watkins interviewed the Child in November 2006 when the Child was nearly five. The Child told Watkins that Father had touched her "pee-pee" in a manner that Watkins concluded was inappropriate. In speaking with Watkins, the Child recalled five separate instances in which Father had touched her "inside"her genital area, all while she was at his home. In her employment, Watkins had interviewed some 900-1000 children. She found nothing to indicate that the Child's statements in the present case had been coached.

Father and his first wife, Amy T., had one daughter together, Lauren, before divorcing in 1996. Amy described Father as being short tempered and argumentative and said he had been physical with her – pushing, grabbing and striking her – "[w]henever he got mad enough." Father had punched holes in walls in two of their homes and broken things. Amy had recently obtained a $20,000 judgment for child support arrearage against Father. Amy noted that, until two years before the trial, Father had been receiving social security benefits for Lauren, of which Amy T. was unaware and had kept the checks even though Lauren lived full-time with her. According to Amy T., Father had obtained the benefits by reporting that Lauren's "mother" was deceased. Amy T. acknowledged that she was a friend of Aunt. Lauren, 18 at the time of trial, tearfully agreed that Father had asked her to call the social security office and tell an official that she lived with him although she actually lived with her mother. Lauren added that she had a good relationship with both her parents and that Father never mistreated her.

Grandmother W. further testified that she had had repeated discussion with Father about his anger problems and also advised him that he "can't go around lying." Asked how often Father lied, she replied, "I don't believe anything that he says because . . . he does so much lying, I don't know when there is truth." After Elizabeth H. planned to leave him, Father told Grandmother W. he would "get help." She recalled an incident when they were eating out during a time when the Child was in state custody and Father had her for a brief visit. The Child was sick, running a fever, and crying for Grandmother W. to hold her. Father grabbed the Child by the arm, said to the Child "this is all your fault" and "hit her hard as he could on her bottom," getting the attention of everyone else in the restaurant. Grandmother W.'s husband, Kenneth W., was also present and recalled that Father had reached across the table, grabbed the Child, "smacked" her, and "jammed her down on his knee." Kenneth W. said "it was all [he] could do to keep from coming up out of [his] chair" in reacting to Father's treatment of the Child. Kenneth W. added that he had witnessed Father lose his temper at his wife, Grandmother W., as well as with the Child other times – "[i]f somebody had made him mad elsewhere, he carried it out there at the house." Kenneth W. further noted in 2007, he had taken Father's gun and kept it after he had repeatedly

-12-

threatened to shoot various people with whom he was angry. Father asserted "I've got a gun and I know how to use it."

Grandmother W. stated that she loved all her children, but did not have a good relationship with Father – she feared him because she "never knew what he might do," and had twice called the police because she wanted him to leave her alone. Grandmother W. had been in the car with Father more than once when he would begin speeding after he became upset about something. Grandmother W. related the Child's complaints that Father had touched her inappropriately. Once, at Grandmother W.'s home, the Child yelled for her to come to the bathroom and told her, "Mamaw, daddy hurt my pee-pee." Another time, she was babysitting and the Child told her she had something to tell Grandmother W., and said, "Mamaw, daddy still hurts my pee-pee." At that point Grandmother W. called and reported the matter to DCS. Another time, when the Child was four, she said she was at home with Father watching television, and he told her he had a present for her and to come sit on his lap. According to the Child, "it wasn't a present" – instead, Father hurt her "pee-pee" and told her if she told anybody, he would hurt her. As late as December 2007, the Child had made the same complaint to Grandmother W . When Grandmother W. observed bruises on the Child's bottom, the Child told her that Father had "whipped her because she was sleeping too late" and Elizabeth H. was not home at the time.

Grandmother T. – the Child's maternal grandmother (the mother of the Child's deceased mother) – testified that Father had a problem controlling his temper – when angry, he had driven "very recklessly . . . very fast and very inappropriately in town" as her daughter urged him to slow down. After her daughter died, Grandmother T. discovered that Father had obtained and used five credit cards in her name without her knowledge and ruined her credit. When the Child was about three, Grandmother T. observed her playing with dolls, and using the "Barbie" doll to strike the "Ken" doll. The Child explained that she did so "because he is mean to the baby." Asked what she meant, the Child told Grandmother T. that "My daddy hurts my pee-pee." The Child said the same thing on two later occasions. Grandmother T. told Aunt about these incidents, but never contacted DCS or the police herself "because the last time anything was brought up about the abuse of [the Child], she was taken away from us by DCS and the only person that could visit her was [Father]; and that, Grandmother T. felt, "was the most horrible thing in the whole world that could happen to her."

The Child made similar complaints to other family members. Steve H., Grandmother T.'s husband, testified that he and the Child had regularly spent time together and when the Child was about four, she twice told him that "[Father] played with her pee-pee." He was aware that the Child "had been saying that to other family members" and it was reported to her guardian ad litem. Kenneth W. – Grandmother W.'s husband – also frequently spent time

with the Child and she sometimes spent the night with him and Grandmother W. He said that the Child had told him that Father hurt her "pee-pee."

Father moved for a directed verdict at the close of Aunt's proof and argued that the proof failed to establish that he was an unfit parent. In denying the motion, the trial court stated:

> [T]here is an abundance of evidence at this juncture . . . for the Court to conclude by clear and convincing evidence that [Father] is an unfit parent on several accounts.
>
> The Court agrees . . . that [Aunt] has also some credibility issues. This [Child] is the focus of this Court's interest. And in the Court's opinion, this [Child] is in a world of hurt right now.
>
> I don't know what is to the best interest of this [Child], but I'm willing to hear any further testimony to make a determination about that.

Charlotte H., had been married to Grandfather the past 10 years. Just after she and Grandfather married, they learned that Father had obtained a department store credit card in their names and run up a large bill. The Child sometimes visited Grandfather's home with Father. From what Charlotte H. could tell, the Child "loves her daddy" and "acted like a normal child" around him. She agreed that Father "mouths off a lot," but she had never seen him angry with the Child. As to Aunt, Charlotte H. said she also had a temper at times. Charlotte H. acknowledged that she had had a phone interview with Dr. Katherine Flagler, one of the evaluating psychologists. In the interview, Charlotte H. had described Father as "very selfish and controlling," commented on his failure to provide support for the Child, and related that "when [Father] gets mad, he loses control," and she had seen Father "holler" at the Child "when she cried and he couldn't do anything with her." Charlotte H. felt that Father had since changed. She said the Child never told her she had been abused by anyone. She agreed that the Child called Aunt "mommy" and was very close to her.

Elizabeth H., Father's wife, was a civil engineer employed as a project manager for a firm in Nashville. She met Father on the internet in 2003 and they married the next year. Based on lies Father had told her and because she was reluctant to be involved in the custody proceedings, Elizabeth H. decided to "protect" herself and filed for divorce. However, she and Father continued "dating" and she forgave him – they remarried in May 2005. According to Elizabeth H., she was present for every one of Father's visits with the Child and normally was the one who drove to pick her up from Aunt. She said the past year was "one

of our better years as a family" because there were no more visits from DCS. She described the Child as being "excited" to see Father when they arrived and said the Child was never fearful of Father.

Elizabeth H. said she and the Child had a "wonderful" relationship. The Child had not complained about anyone touching her inappropriately and, to her knowledge, never had nightmares. Elizabeth H. described Father's temperament as "even-keel[ed];" she had not seen him angry at anyone and they had had only 2 arguments in their five years of marriage. She said Father did not spank the Child and they had agreed before marrying that they would discipline their children with "time-outs." She said the Child never required discipline in their care because she never got into trouble. From their limited interactions, Elizabeth H. believed that Aunt was "easily aggravated." According to Elizabeth H., the Child bruised her bottom when she was bouncing on a bed with her nephews and fell, hitting a bookcase and she didn't think to inform Aunt about the incident.

Grandfather said Aunt had worked for him at his tanning salon for several years until he fired her because she kept calling and accusing him of "taking sides" with Father regarding the Child's custody; at the time of the trial, Grandfather had no relationship with Aunt. As a teenager, Aunt had accused him of physically abusing her and filed formal charges, but they were dismissed. During frequent visits to his home, Grandfather had observed the Child hugging, kissing and wanting to play games with Father. He believed they loved each other and never witnessed anything inappropriate. According to Grandfather, Aunt "gets mad very easy." He was unaware of Father having problems with telling lies or controlling his temper. Questioned by the court, Grandfather said he was unaware of the admitted lies Father had told to get better jobs. Further, he could not recall Father getting a credit card in his and Charlotte H.'s name without their permission and amassing a large bill. In Grandfather's opinion, either Aunt or Father would be fit to raise the Child, but he believed a parent should raise his own child.

Aunt explained that she again sought custody of the Child in 2004 because she couldn't count on Father to follow the agreed co-parenting plan or be there for the Child. She said Father would not return the Child as specified or would fail to exercise his visitation and leave the Child with her without notice and never check on the Child. In the past, Aunt had seen Father punch his then-pregnant wife in the leg and he had pushed Aunt against a wall when he got angry. Since she had gotten custody of the Child, Aunt had notified Father that the Child was having eye surgery and dental surgery and Father was not present either time. In earlier years, when Father first took the Child overnight, he had returned her the next morning wearing the same diaper and failed to administer prescription medicines she had sent with the Child for her asthma.

According to Aunt, the Child continued to make allegations that Father was touching her inappropriately while the permanency plan was still in effect and through 2006. There had been no further allegations of abuse since 2007. Aunt said after one court hearing, the Child told her that Father had told the Child he had heard what the Child had "told those people" and warned the Child she "better not be telling people that stuff again. . . ." Aunt had two young sons of her own. In June 2009, her thirteen-year old son died suddenly while playing basketball at his middle school and her family was grieving the loss of that child during the Child's ongoing case.

Tabitha Damron, clinical director of the Children's Advocacy Center, provided therapy to the Child on a referral by DCS beginning in August 2005 when the Child was four and continuing over 15 more sessions until May 2006. In their sessions, the Child disclosed that Father had "hurt her pee-pee" on three occasions. In addition, in November 2005, the Child came in with a "busted lip – it was red and had a cut on the inside." Damron asked the Child what happened to her lip and "she said [Father] did this and demonstrated hitting her lip with an open hand."

At the conclusion of the hearing, the trial court "restored" full custody of the Child to Father upon its conclusion that Aunt had failed to show a risk of substantial harm to the Child in Father's custody. Aunt filed a timely notice of appeal.

## II.

Aunt raises three issues for our review:

> 1. Whether the trial court erred in placing the Child in Father's custody.
>
> 2. Whether the trial court erred in failing to review all the evidence presented.
>
> 3. Whether the trial court erred by admitting evidence on behalf of Father contrary to the rules of evidence.

## III.

A trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d) (2006); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). We review a trial court's conclusions of law under a de novo standard upon the record with no presumption of

-16-

correctness. ***Campbell v. Florida Steel Corp.***, 919 S.W.2d 26, 35 (Tenn. 1996); ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993). However, if the trial court fails to make findings of fact, our review is de novo with no presumption of correctness. ***Archer v. Archer***, 907 S.W.2d 412, 416 (Tenn. Ct. App. 1995). We review a trial court's determinations of witness credibility with great deference and will not re-evaluate a trial judge's credibility determinations unless they are contradicted by clear and convincing evidence. ***Wells v. Tenn. Bd. of Regents***, 9 S.W.3d 779, 783 (Tenn. 1999).

As a general rule, decisions regarding custody and visitation are within the broad discretion of the trial judge and will not ordinarily be reversed absent some abuse of that discretion. ***Otis v. Cambridge Mut. Fire Ins. Co.***, 850 S.W.2d 439, 442 (Tenn. 1992); ***Suttles v. Suttles***, 748 S.W.2d 427, 429 (Tenn. 1988). Accordingly, a trial court's discretion will be upheld so long as reasonable minds can disagree as to the propriety of that decision. A trial court abuses its discretion when it "applies an incorrect legal standard, or reaches a decision which is against logic or reasoning that causes an injustice to the party complaining." ***Eldridge v. Eldridge***, 42 S.W.3d 82, 85 (Tenn. 2001)(quoting ***State v. Shirley***, 6 S.W.3d 243, 247 (Tenn. 1999)).

IV.

The trial court's ruling with regard to custody of the Child appears, in its entirety, as follows:

> After hearing testimony, the argument of counsel, and reviewing the record as a whole, the Court made its ruling, and it is therefore
>
> ORDERED, ADJUDGED and DECREED:
>
> 1. That [Aunt] [has] failed in [her] burden to prove that there is a greater weight of evidence of substantial harm to the [C]hild if she were left in the custody and care of her Father.
>
> 2. That having failed to show that substantial harm to the minor [C]hild exists; the Petition is hereby dismissed with full legal and residential custody of [the Child] restored and reaffirmed with her Father.

The trial court's bench ruling adds little to elucidate its custody determination. The court stated:

> [T]he Court is gravely concerned about the welfare of an 8-year-old child. [Father] . . . has by his own testimony proved himself to be a habitual liar whose testimony the court could not and . . . should not consider.
>
> [Aunt] . . . is emotionally traumatized as the result of several factors. This [C]hild has not a good place to go. And in a perfect world, the Court could look to simply the best interest of this [C]hild and could possibly conclude that her best interest would be served by being placed in neither home, but in some other home. But the Court is unable to judge this case based on the best interest of this [C]hild.
>
> &ast;   &ast;   &ast;
>
> The Court holds the first and foremost issue is under a "substantial harm to the child" analysis. And so it is the Court's job at this juncture to make a determination of whether or not [Aunt] [has] carried [her] burden by showing to the Court by the greater weight of the evidence that a substantial harm will occur to this [C]hild by leaving her or by placing her with her natural parent.
>
> I can tell you it is a close call, but I can also tell you that this Court is persuaded by the evidence that [Aunt] [has] failed to carry [her] burden by the greater weight of the evidence in this case.
>
> Applying the law to the facts is a hard thing to do sometimes. And to the lay person, it seems sometimes that the Court is making an arbitrary decision. I can tell you that I have struggled with the decision I have made today, knowing that harm could come to this [C]hild, but that in the Court's opinion, there is not a substantial likelihood that a substantial harm would come to this [C]hild by remaining with her natural parent.

Our review of the trial court's judgment would ordinarily be de novo with a presumption that its findings of fact are correct. *See* T.R.A.P. 13(d). As we have noted, however, the trial court in this case made no findings of fact, written or otherwise, relative to its custody determination. When the trial court fails to make findings of fact there is nothing to which the presumption of correctness can attach. In such a situation, our review is de novo without a presumption of correctness. ***Goodman v. Memphis Park Comm'n***, 851 S.W.2d 165, 166 (Tenn. Ct. App. 1992); ***Kelly v. Kelly***, 679 S.W.2d 458, 460 (Tenn. Ct. App. 1984). Accordingly, we conduct our de novo review of the record to determine the facts and the resolution of the issue presented as established by the preponderance of the evidence. ***Ganzevoort v. Russell***, 949 S.W.2d 293, 296 (Tenn. 1997).

V.

Aunt argues that Father has disregarded the Child's welfare throughout the Child's life and that he has been and continues to be an unfit parent to the Child. She concludes that the evidence demonstrates a risk of substantial harm to the Child if she is left in Father's custody. Aunt points in particular to the allegations that Father has sexually abused the Child and that he has an anger management problem that he has displayed in his treatment of the Child.

Parents have a fundamental liberty interest regarding the custody of their children. ***Santosky v. Kramer***, 455 U.S. 745, 753, 71 L. Ed. 2d 599, 102 S. Ct. 1388 (1982); ***In re Askew***, 993 S.W.2d 1, 3 (Tenn. 1999); ***Bond v. McKenzie***, 896 S.W.2d 546, 547 (Tenn. 1995). A court may not deprive a natural parent of custody of their child in favor of a third party unless the court determines the parent is unfit or there is a danger of substantial harm to the child. ***In re Swanson***, 2 S.W.3d 180, 188 (Tenn. 1999); ***In re Askew***, 993 S.W.2d at 4. As the natural parent has superior rights against third parties, a third party seeking custody carries the burden of proof. ***In re Askew***, 993 S.W.2d at 4-5. The third party must show the danger of substantial harm or the unfitness of a parent by a "clear preponderance of convincing proof." ***Stubblefield v. State ex rel. Fjelstad***, 171 Tenn. 580, 106 S.W.2d 558, 560 (Tenn. 1937); ***Henderson v. Mabry***, 838 S.W.2d 537, 540 (Tenn. Ct. App. 1992). Stated differently, this Court is charged with reviewing the record to determine whether the evidence presented clearly and convincingly established that the Child would be exposed to a risk of substantial harm if placed in Father's custody. ***Ray v. Ray***, 83 S.W.3d 727, 733 (Tenn. Ct. App. 2001).

Regarding the level of proof required, this Court has observed:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability

-19-

of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*Id*. at 732.

Because the trial court failed to make findings of fact to which the presumption of correctness could attach, we must undertake a review of the record to determine where the preponderance of the evidence lies in this case. This we will now do.

The record in the present case contains clear evidence calling into question Father's ability to parent the Child. The proof showed that Father essentially abandoned the Child in the care of Aunt and Grandmother W. in the Child's infancy, just after she lost her mother. He did not physically care for her and provided no support whatsoever to those who did. His lack of support for this Child was not inconsistent with the $20,000 in past child support he owed his first child's mother. When Father did have limited involvement with her care, his decisions reflect that he did not consider the Child's needs first, such as when he refused treatment for the Child's breathing problem.

In our view, such acts and omissions by Father are in keeping with the behavior and character that he has displayed in other aspects of his life. As set out earlier in this opinion, Father has been unstable in his personal and familial relationships, his employment history, and his financial circumstances. Father has found it acceptable to get through much of his life by lying or misleading those around him whenever it suited his own selfish needs. Contrary to Father's assertion that he lied only to get better jobs, there was credible proof that he also lied about his personal relationships, lied to the psychologists in their custody evaluations and testing, lied to his relatives, and even lied to the trial court while testifying. Also of concern is Father's anger, in attitude and action, testified to by nearly all of the witnesses. In some instances, Father's angry outburst included physical violence against others and property damage. There is no proof before us that Father ever obtained treatment for his anger issues as had been ordered by the juvenile court. At the close of Aunt's proof, the trial court found that the evidence established Father to be an unfit parent "by many accounts." At the close of the trial, the trial court concluded that it was a "close call" and noted its "grave concerns" for the Child's welfare, but found that Aunt had failed to show that placing the Child in Father's custody posed a risk of substantial harm to the Child. We cannot agree with this assessment by the trial court.

-20-

Regarding the allegations of abuse, all but one of the Child's claims of being inappropriately "touched" were determined to be "unfounded" by DCS based on a lack of evidence to support the allegations. The fact remains, however, that a disinterested medical professional concluded that the Child had sustained trauma consistent with molestation when the Child was brought to the hospital after returning from a stay with Father. Whether Father or someone else harmed the Child, Father was responsible for her safety and well-being at the time of the injury. Further, the Child's therapist observed the Child with a "busted lip," and reported the Child's claim that Father had slapped her across the mouth. Rather than embracing his extremely limited time with the Child while in DCS custody, Father displayed anger and impatience, "smacked" her while visiting a restaurant with other relatives present, and even blamed the Child for his predicament. After the Child had spent some six months in state custody as a result of the alleged abuse and was denied any contact with Aunt, it was Aunt that petitioned for her to be returned to Aunt or any other suitable relative rather than allowing her to remain in foster care any longer.

In our view, consideration of the evidence presented leads to the conclusion that there is a real, significant, and even likely chance that the Child – who, at the age of seven plus, regressed to "baby talk" and expressed feelings that she is not safe in the custody of Father – will not thrive and become a "healthy, productive" adult if left to develop in Father's care. Faced with such evidence, we are persuaded that Father is presently unfit to parent the Child. "A finding that a parent is unfit or that a child is dependent and neglected may constitute a threat of substantial harm." *In re Askew*, 993 S.W.2d at 4. Moreover, in his custody petition, Father sought primary custody of the Child with "ample" visitation with Aunt, but at the same time requested that Aunt be restrained from "interfering with [Father's] life and the upbringing of [the Child] any further." How a natural parent "intends to exercise his parental prerogatives is relevant to the question of custodial fitness." *Ray*, 83 S.W.3d at 737. In view of Father's arrest for custodial interference in the present case and his history of being untruthful, we are less than confident in Father's assertion that the Child will be permitted the opportunity to continue the close relationship she has developed with Aunt if the decision is to be left to Father.

For Aunt to prevail in her effort to gain custody of the Child, she was required to show, by clear and convincing evidence, that allowing Father to have custody of the Child exposed her to a risk of substantial harm. On our review, we conclude that Aunt has met her burden of proof by establishing that Father is not fit to parent the Child. Accordingly, because the evidence preponderates against the trial court's finding that no risk of substantial harm to the Child exists, we reverse the trial court's decision placing custody of the Child with Father.

VI.

We turn to a consideration of the best interest of the Child regarding her custodial placement, guided by the relevant factors enumerated in Tenn. Code Ann. § 36-6-106.[6] In our

---

[6]Those factors are:

(1) The love, affection and emotional ties existing between the parents or caregivers and the child;

(2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment. . . ;

(4) The stability of the family unit of the parents or caregivers;

(5) The mental and physical health of the parents or caregivers;

(6) The home, school and community record of the child;

(7) (A) The reasonable preference of the child, if twelve (12) years of age or older;

(B) The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person . . . ;

(9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and

(10) Each parent or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child.

view, our determination that it is in the Child's best interest to be raised by Aunt and her husband is accurately set out in the testimony of Dr. Lance Laurence as follows:

> [Aunt and her husband] have been the primary caretakers for [the Child] since she was born as the result of the tragic and sudden death of her mother and [Father's] absences. Her earliest attachments were formed with [Aunt and her husband].
>
> [Aunt and her husband's] marriage, by all appearances, is the more stable home. [The] employment history [of Aunt's husband] determines he is a reliable provider for his family. Therefore, we recommend [Aunt and her husband] be given primary residential custody of [the Child].
>
>         \*    \*    \*
>
> The other thing in terms of [Aunt and her husband's] situation . . . it is clear that [the Child] is very, very attached to these people. She calls [Aunt] mom. She is distressed when she reports that she is told not to call [Aunt] mom.
>
> She in fact has some separation issues from [Aunt] at times because she is afraid she is not going to be able to get back to [Aunt]. [Aunt] has been the emotional mother . . . for this youngster.
>
>         \*    \*    \*
>
> And while it was best for [the Child], they are the ones who have been through the midnight feedings, the illnesses, and the developmental milestones. They are and have been the "parents" . . . even though she is not their biological child.
>
> [Wife's husband] has been a stabilizing force in [Aunt's] life. He works and provides for the [C]hild. He has been the one providing for the [C]hild all these years in terms of child support monies, insurance, all of those sorts of things. And he appears to have no interest in keeping the chaos alive. He struck us as a kind, gentle soul.

The proof shows that Aunt and her husband willingly took in the Child as an infant and have continued at every opportunity since then to provide her a stable, supportive home environment to the best of their ability. By all accounts, the Child loves Aunt, who she considers her "mommy," and her uncle and they, in turn, love her as one of their own. In their care, she appears to be a happy, active child who excels in school despite the turmoil she has undoubtedly experienced as a result of the custody case. Aunt and her husband, despite their own personal struggles, have provided for the Child's every need, with or without support from anyone else. At the time of the trial, Aunt had become a homemaker, available to attend to the Child, while her husband continued to support the family. In summary, we agree with Dr. Laurence's recommendation that the courts should "stabilize things for this little girl and get her in a stable environment and get her out of this kind of continuous conflict." To that end, we conclude the Child's best interest is served by returning her to Aunt and her husband.

VII.

Lastly, Aunt raises two additional issues. First, Aunt asserts that the trial court failed to review all the relevant evidence in this matter, referring in particular to the deposition of Tabitha Damron, the Child's therapist. Aunt also challenges the trial court's admission of certain exhibits introduced by Father on hearsay and other grounds. In view of our holding, we find it unnecessary to address these evidentiary challenges.

VIII.

The judgment of the trial court is reversed and full custody of the Child is hereby granted to Rhonda H. and her husband. Randy H. will immediately transfer physical custody of the Child to Rhonda H. and her husband and will immediately cooperate with them in ensuring that all future social security payments for the benefit of the Child as a result of the death of her mother are sent to Rhonda H. and her husband. Costs on appeal and at the trial court level are taxed to the appellee, Randy H. This case is remanded to the trial court for enforcement of our judgment. On remand, the trial court will hold a hearing to set an appropriate amount of child support to be paid by Randy H. to Rhonda H. and her husband.

_____
CHARLES D. SUSANO, JR., JUDGE